UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.  04 CV 10746 JLT

IVAN SANTIAGO,
    Plaintiff

v.

WILLIAM J. FEENEY, MARCUS EDDINGS, and the CITY OF BOSTON,
    Defendants

### DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF FACTS AND SUPPORTING EXHIBITS

Pursuant to Fed. R. Civ. P. 56, the Defendant Marcus Eddings ("Defendant Eddings") and Defendant Feeney ("Defendant Feeney") hereby move this Honorable Court to grant partial summary judgment in their favor as to Counts I and II of Plaintiff's Complaint, insofar as those counts allege that the Plaintiff's strip search was a violation of his federal and state constitutional rights.  Further, Defendant City of Boston ("City") hereby moves this Honorable Court to grant partial summary judgment in its favor as to Count III of Plaintiff's Complaint, insofar as that count alleges that the City is liable pursuant to 42 U.S.C. §1983 for the Plaintiff's strip search.

As grounds for this motion, the Defendants hereby collectively state the following:

1. On March 14, 2003, Boston Police Officer Paul T. Quinn ("Officer Quinn") completed an affidavit in support of a search warrant ("Affidavit"). (Ex. E, at 1). At the time, Officer Quinn was assigned to the Drug Control Unit in Area B-2. (Ex. E, at 1).

2. Within the month previous to completing the Affidavit, Officer Quinn, along with other members of the Area B-2 Drug Control Unit, received information from a Confidential Informant ("Informant") relative to illegal drug sales of crack cocaine at 58 Cheney Street, Apt. #5 in Dorchester, MA. (Ex. E, at 1).

1

3. Officers were highly familiar with Cheney Street as an active area for drug sales and had executed numerous drug related search warrants on Cheney Street at various apartments over the previous several years.  (Ex. E, at 1).

4. The Informant stated to Officer Quinn that on numerous occasions in the past he had purchased crack cocaine from a white Hispanic male at 58 Cheney Street, Apt. #5.  (Ex. E, at 1).

5. To confirm or deny the allegations of the Informant, Officers conducted a controlled purchase of crack cocaine from 58 Cheney Street, Apt. #5.  (Ex. E, at 2).

6. After searching the Informant and finding him to be free of any drugs or contraband, they supplied him with Department issued U.S. currency; they watched the Informant proceed to 58 Cheney Street and enter through the main door; and after a few moments the Officers observed the Informant exit 58 Cheney Street.  (Ex. E, at 2).

7. Upon returning to the Officers, the Informant turned over a rock like substance believed, based on the Officers' training and experience, to be crack cocaine.  (Ex. E, at 2).

8. The Informant stated to the Officers that he had moments earlier purchased the crack cocaine from inside 58 Cheney Street, Apt. #5, and gave a description of the individual from whom it was purchased.  (Ex. E, at 2).

9. On a subsequent date the Officers met with the Informant again for the purposes of conducting another a controlled purchase of crack cocaine from 58 Cheney Street, Apt. #5.  (Ex. E, at 2).

10. After searching the Informant and finding him to be free of any drugs or contraband, they supplied him with Department issued U.S. currency; they watched the Informant proceed to 58 Cheney Street and enter through the main door; and after a few moments the Officers observed the Informant exit 58 Cheney Street.  (Ex. E, at 2).

11. Upon returning to the Officers, the Informant turned over a rock like substance believed, based on the Officers' training and experience, to be crack cocaine.  (Ex. E, at 3).

12. The Informant stated to the Officers that he had moments earlier purchased the crack cocaine from inside 58 Cheney Street, Apt. #5, and gave a description of the individual from whom it was purchased.  (Ex. E, at 3).

13. The Informant stated that the purchase was made from the same individual as the prior occasion. (Ex. E, at 3).

14. Officers Kenneth Hearns and Defendant Eddings During conducted surveillance before and after the controlled purchase, and noted heavy foot traffic in and quickly out of 58 Cheney Street via the front door. (Ex. E, at 3). This type of traffic to and from a location was consistent with drug activity from the building. (Ex. E, at 3).

15. During the course of this investigation, Officer Quinn contacted the business that oversees the property at 58 Cheney Street, informed the manager of the investigation and inquired as to whom the listed occupants of Apt. #5 were. (Ex. E, at 3). Management informed Officer Quinn that the apartment was occupied by Jacqueline Lugo, and an infant born in 2001. (Ex. E, at 3).

16. Management informed Officer Quinn that no males were listed as tenants of 58 Cheney Street, Apt. #5. (Ex. E, at 3).

17. Officer Quinn then retrieved several booking photos of white Hispanic males in the age bracket of 20-30 years old with the last name "Lugo." (Ex. E, at 3).

18. Officer Quinn again met with the informant to conduct a controlled purchase of crack cocaine. (Ex. E, at 3).

19. Prior to the controlled purchase, Officer Quinn showed the Informant the booking photos he had obtained. (Ex. E, at 3).

20. Upon seeing a photograph of Rolando Lugo, the Informant stated to the officers that the person in the photo was the person he had purchased crack cocaine from during the previous two controlled purchases. (Ex. E, at 3).

21. After searching the Informant and finding him to be free of any drugs or contraband, they supplied him with Department issued U.S. currency; they watched the Informant proceed to 58 Cheney Street and enter through the main door; and after a few moments the Officers observed the Informant exit 58 Cheney Street. (Ex. E, at 4).

22. Upon returning to the Officers, the Informant turned over a rock like substance believed, based on the Officers' training and experience, to be crack cocaine. (Ex. E, at 4).

23. The Informant stated to the Officers that he had moments earlier purchased the crack cocaine from inside 58 Cheney Street, Apt. #5, from the individual he had just observed in the photograph and identified as Rolando Lugo. (Ex. E, at 4).

3

24. The Informant described the door to Apt. #5 as brown in color, with a number 5 clearly posted on it and a "Jesus" sign underneath the peephole of the door. (Ex. E, at 4).

25. Conducting a Board of Probation Inquiry of Rolando Lugo, Officer Quinn located an incident report which listed a home address that was a very short walk from 58 Cheney Street. (Ex. E, at 4).

26. Based on three successful controlled purchases of crack cocaine by the Informant from Rolando Lugo inside of 58 Cheney Street, Apt. #5, and the heavy foot traffic to and from 58 Cheney Street consistent with drug activity, Officer Quinn stated in his *Affidavit in Support of Application For Search Warrant* ("Affidavit") that he had probable cause to believe that Rolando Lugo was keeping and selling crack cocaine at that address. (Ex. E, at 4).

27. In his Affidavit, Officer Quinn also stated that, due to the unpredictable nature of persons coming to 58 Cheney Street, Apt. #5 to purchase crack cocaine, he was also requesting permission to search any person present at the execution of the warrant. (Ex. E, at 4).

28. On March 14, 2003, first assistant clerk magistrate Patricia F. McDermott signed Officer Quinn's Affidavit. (Ex. E, at 4).

29. Also on March 14, 2003, Officer Quinn signed an Application for a Search Warrant. (Ex. F, at 1). Part of the Application provided that: "Based upon this information, there is also probable cause to believe that the property [crack cocaine] may be found (check as many as apply)," below which was a box checked "on any person present who may be found to have such property in his or her possession or under his or her control or to who, such property may have been delivered." (Ex. F, at 1). There was also a box checked identifying 58 Cheney Street, Apt. #5, and a box checked indicating "on the person or in the possession of…. Rolando Lugo." (Ex. F, at 1).

30. The Application for a Search Warrant was signed by first assistant clerk magistrate Patricia F. McDermott on March 14, 2003. (Ex. F, at 1).

31. Pursuant to the Application, there was a Search Warrant issued and signed by first assistant clerk magistrate Patricia F. McDermott, also on March 14, 2003, in which she found that there was probable cause to believe that there was unlawfully possessed property. (Ex. F, at 2). Pursuant to that finding, the Warrant provided that officers were "commanded… to search for the following property: cocaine, a Class B Controlled Substance and all implements used in the cutting, bagging, weighing and distribution of Cocaine. Any hooks, notes, papers of ledgers denoting drug transactions and any money derived from drug transactions. Any personal papers and/or effects showing occupancy or control of

4

58 Cheney St., Apt. #5, Dorchester, MA including keys to this location." (Ex. F, at 2).

32. The Search Warrant commanded officers to search for the described property at: "[a]ll rooms, closets, storage areas located inside of 58 Cheney St., Apt. #5, Dorchester, MA and all common areas the occupants of 58 Cheney St., Apt. #5 have access to including the hallway and the basement. 58 Cheney St., Apt. #5 in Dorchester is a large 4 story brown brick building with the #58 clearly posted above the outer entry door. Apt. #5 at 58 Cheney is on the 2nd floor. The door to Apt. #5 is brown and the number 5 clearly posted on the door. The words 'I ask Jesus' are on the door to Apt. #5 [which is occupied by and/or in the possession of] Rolando Lugo, 02/18/81…. A W/H male approx. 6'00", thin build." (Ex. F, at 2).

33. The Search Warrant commanded officers to search for the described property at the described location on the person or in the possession of "any person present who may be found to have such property in his or her possession or under his or her control or to whom such property may have been delivered." (Ex. F, at 2).

34. The Search Warrant was pre-approved by Assistant District Attorney Michael Cornelius. (Ex. G, at 1).

35. On March 20, 2003, at approximately 10:53 a.m., members of the Area B-2 Drug Control Unit executed the Search Warrant under the supervision of Defendant Feeney. (Ex. G, at 1; Ex. C, at 15:2).[1]

36. As Officers were approaching the target apartment from the rear entrance of the building, officers heard a female shout from 58 Cheney St., Apt. #5 "Gabriel and Ivan, they're raiding, they're raiding!!!"[2] (Ex. G, at 1; Ex. B, at 30:2-4; Ex. C, at 17:19-24).

37. Defendant Eddings also made entry through the rear part of the building. (Ex. B, at 15:24 – 16:1)

38. Officers reached the door to Apt. #5, knocked and announced "Boston police, search warrant." (Ex. G, at 1). After receiving no response after knocking and announcing their presence, and fearing that evidence was being destroyed, the Officers utilized a key they had obtained and opened the door. (Ex. G, at 1).

39. Defendant Eddings initial role was to secure the premises. (Ex.B, at 18:7-11). Defendant Eddings then proceeded to the rear of the apartment. (Ex.B, at 17:22 – 18:1).

---

[1] Where X:Y citation is made to deposition testimony, X is the page number and Y is the line number.
[2] As entry was being made into the building, Defendant Feeney testified that he was told by other officers "they're yelling we're coming, the police are coming, 5-0 is coming." (Ex.C, at 17:19-24).

40. Defendant Eddings was wearing gloves during the search for sanitary reasons. (Ex.B, at 59:9-11; 60-4-6; Ex.D at 35:24 – 36:1).  All or most of the officers participating in the search were wearing gloves.  (Ex. C, at 51:6-9; Ex.D at 35:24 – 36:1),

41. Most times gloves are discarded in trash cans after an apartment is searched; sometimes the police take the gloves with them.  (Ex.C, at 51:16-20).

42. Rolando Lugo was present in the apartment and placed under arrest by Officer Ross.  (Ex. G, at 1).

43. Other persons in the apartment were identified as Jacqueline Lugo, her son Gabriel, and Plaintiff Ivan Santiago.  (Ex. G, at 1-2).  They were kept in the living room area.  (Ex.C, at 11-18).

44. The Plaintiff was handcuffed.  (Ex. C, at 25:11-14).

45. After advising Rolando Lugo of his Miranda rights, Officers Quinn and Broderick advised that he give up any drugs, money or firearms that were in the apartment.  (Ex. G, at 2).

46. Rolando Lugo stated that there were some .380 rounds in the corner of the bedroom, drug paraphernalia in the drawer of the bedroom, that he had about $400-$500 on him, and that he also had some "drugs in his ass."  (Ex. G, at 2).

47. Officers recovered the drug paraphernalia from the drawer, and after uncuffing Mr. Lugo, he retrieved from his buttocks area a plastic bag containing six smaller bags of crack cocaine.  (Ex. G, at 2; Ex.C, at 8-19).

48. After finding neither the money nor the ammunition that Mr. Lugo stated was in the apartment, he was questioned further and stated to Defendant Feeney that there was some crack cocaine in a stuffed animal located on the dresser.  (Ex. G, at 2-3).

49. Officer Ross proceeded to recover a medium bag of cocaine from a stuffed animal.  (Ex. G, at 3).

50. While Mr. Lugo was being questioned, Defendant Eddings participated in the search of the kitchen and the bathroom of Apt. #5 at 58 Cheney Street.  (Ex. B, at 19:9-10).

51. After Defendant Eddings searched the kitchen and bathroom, he returned to the front part of the apartment.  (Ex.B, at 19:17-18).

52. Ivan Santiago was in the front part of the apartment and handcuffed.  (Ex.B, at 22:10-11).

6

53. After returning to the front part of the apartment, it was determined that Ivan Santiago had not been searched for narcotics. (Ex.B, at 24:1-8).

54. Defendant Feeney told Officer Eddings to take the Plaintiff into the bathroom and search him. (Ex.C, at 34:21-22).

55. Defendant Feeney thought that Officer Eddings was going to strip search the Plaintiff. (Ex.C, at 34:23 – 35:1).

56. Based on the totality of the circumstances, Defendant Eddings believed that he had probable cause to conduct a strip search. (Ex.B, at 37:2-4; 37:21 – 38:1; 40:17; 43:3-7; 57:16-20).

57. Defendant Feeney believed that there was probable cause to conduct a strip search. (Ex. C, at 35:2-7; Ex. C, at 37:1-12).

58. Defendant Eddings walked the Plaintiff to the bathroom to perform a strip search. (Ex.B, at 28:7-21).

59. Defendant Eddings removed the Plaintiff's handcuffs. (Ex.B, at 31:15-19; Ex.D at 35:10-13; Ex.D at 37:10-13).

60. The bathroom door was closed, but left open a little bit. (Ex.B, at 55:6-15).

61. Defendant Eddings instructed the Plaintiff to begin removing his articles of clothing, one piece at a time. (Ex. A, at ¶14; Ex.B, at 32:8-14).

62. The Plaintiff was instructed to remove every piece of his clothing. (Ex.B, at 32:17-19).

63. Once all of the Plaintiff's clothes were removed, Defendant Eddings asked him to lift up his scrotum and to turn around. (Ex.B, at 41:22 – 42:2).

64. Defendant Eddings asked the Plaintiff to turn around, spread his butt cheeks, and bend forward. (Ex. A, at ¶15; Ex.B, at 42:8-11; Ex.D at 39:).

65. It was determined that the Plaintiff did not have any drugs on him, so Defendant Eddings told the Plaintiff to put his clothes back on, recuffed him and walked him back to the living room. (Ex.B, at 40:17-22; Ex. D, at 42:22).

66. The Plaintiff was not arrested. (Ex.B, at 56:21-23).

67. The Boston Police Department's Rules and Procedures, Rule 318D ("Rule 318D") was issued to establish "guidelines, regulations and procedures outlining

when and how Strip Searches and Body Cavity Searches may be performed." (Ex.H at 1).

68. Rule 318D, Sec.1 provides that "during the course of a custodial search, police officers may uncover evidence, contraband or other items… [w]hen an officer has a Probable Cause that an arrestee has such contraband and/or weapon(s) in his or her possession and when a 'pat down' is inconclusive and/or is an impractical method of searching for such contraband and/or weapon(s), it may be necessary for officers to conduct a 'strip search.'" (Ex.H at 1).

69. Rule 318D, Sec.2 defines a "strip search" as [t]he removal or rearrangement of some or all of the arrested person's clothing so as to permit a visual inspection of the breasts, buttocks, anus, or genitalia. This does not include any touching or prodding of body parts." (Ex.H at 1).

70. Rule 318D, Sec.2 defines a "body cavity search" as [a] search conducted pursuant to a warrant that authorizes a physician to conduct an internal manual inspection of any human body cavity." (Ex.H at 1).

71. Rule 318D, Sec.4 provides that police officers "are prohibited from conducting a 'strip search' outside the confines of the District Station, unless such search is authorized by a warrant." (Ex.H at 2).

*WHEREFORE*, Defendants hereby move this Honorable Court for partial dismissal by summary judgment of all counts of the Plaintiff's Complaint against them insofar as those counts allege that the Plaintiff's strip search was a violation of his constitutional rights.

**DEFENDANTS REQUESTS AN ORAL ARGUMENT FOR THIS MOTION**

Respectfully submitted,

DEFENDANTS WILLIAM J. FEENEY,
MARCUS EDDINGS, and the CITY OF
BOSTON
Merita A. Hopkins
Corporation Counsel
By their attorney,


S/Stephen G. Cox
_____
Stephen G. Cox    BBO# 566943
Assistant Corporation Counsel
City of Boston Law Department
Room 615, Boston City Hall
Boston, Massachusetts 02201
(617) 635-4064

## EXHIBITS

A      Plaintiff's Complaint

B      Deposition of Marcus Eddings, 10/26/04

C      Deposition of William F. Feeney, 1/10/05

D      Deposition of Ivan Santiago, 1/18/05

E      Affidavit in Support of Application For Search Warrant, 3/14/03

F      Search Warrant Docket No. 03-02-SW-0027, 3/14/03

G      Boston Police Incident Report, Complaint No. 030144308, 3/20/03

H      Boston Police Department Rule 318D, Strip Search and Body Cavity Procedures