MARCUS EDDINGS
October 26, 2004

```
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF MASSACHUSETTS
 3                  Civil Action No.: 04CV10746JLT
 4
 5   *************************************
 6   IVAN SANTIAGO,                      *
 7           Plaintiff                   *
 8                                       *
 9   vs.                                 *
10   WILLIAM J. FEENEY, MARCUS           *
11   EDDINGS, and the CITY OF            *
12   BOSTON,                             *
13           Defendants                  *
14   *************************************
15
16           DEPOSITION OF:   MARCUS EDDINGS
17           LAW OFFICES OF HRONES & GARRITY
18                  232 Lewis Wharf
19                Boston, Massachusetts
20           October 26, 2004       2:10 p.m.
21
22
23                Barry Michael Harris
24                   Court Reporter
```

MARCUS EDDINGS
October 26, 2004

Page 2

```
 1   APPEARANCES:
 2
 3   Representing the Plaintiff:
 4     HRONES & GARRITY
 5     232 Lewis Wharf
 6     Boston, MA 02110
 7     (617) 227-4019  Fax (617) 227-3908
 8     BY: STEPHEN HRONES, ESQ.
 9
10   Representing the Defendants:
11     CITY OF BOSTON LAW DEPARTMENT
12     1 City Hall Square, Rm. 615
13     Boston, MA 02201
14     (617) 635-4034  FAX (617) 635-3199
15     BY: STEPHEN G. COX, ESQ.,
16     Assistant Corporate Counsel
17
18   ALSO PRESENT:
19   Michael Tumposky
20   Tim Brown
21
22
23
24
```

Page 3

```
 1              INDEX
 2
 3   WITNESS:  MARCUS EDDINGS
 4
 5   EXAMINATION BY:              PAGE
 6   Mr. Hrones                    4
```

Page 4

```
 1        MR. HRONES: All objections saved
 2   to the time of trial except for form of
 3   question and motions to strike.
 4        The witness will read and sign
 5   within 45 days and waive notary.
 6        MR. COX: That's fine.
 7        MR. HRONES: Please swear in the
 8   witness.
 9
10
11        MARCUS EDDINGS, Deponent, having first
12   been duly sworn, was deposed and states as
13   follows:
14
15
16        EXAMINATION BY MR. HRONES:
17
18   Q.  What is your name?
19   A.  Marcus Eddings.
20   Q.  Have you ever been deposed before?
21   A.  No.
22   Q.  If you don't understand a question,
23   let me know that, and I will try and rephrase it.
24        From time to time, your lawyer may
```

Page 5

```
 1   make objections, so when I ask a question,
 2   hesitate a second, and if he objects, you can
 3   still answer the question unless he specifically
 4   tells you not to. The objections are made for
 5   the record.
 6   A.  Okay.
 7   Q.  What is your occupation?
 8   A.  I'm a police officer.
 9   Q.  Where?
10   A.  The City of Boston.
11   Q.  How long have you been a police
12   officer?
13   A.  In my eighth year.
14   Q.  Where were you born?
15   A.  Boston, Massachusetts.
16   Q.  And your date of birth?
17   A.  03/25/66.
18   Q.  Are you married?
19   A.  Yes.
20   Q.  Do you have any children?
21   A.  No.
22   Q.  How long have you been married?
23   A.  11 years.
24   Q.  Where did you go to high school?
```

2 (Pages 2 to 5)

MARCUS EDDINGS
October 26, 2004

Page 6

| | | |
|---|---|---|
| 1 | A. | Boston Technical High. |
| 2 | Q. | You graduated? |
| 3 | A. | Yes, sir. |
| 4 | Q. | What year was that? |
| 5 | A. | 1984. |
| 6 | Q. | What did you do right after |
| 7 | graduation? | |
| 8 | A. | I went to college. |
| 9 | Q. | Right out of high school? |
| 10 | A. | Yes. I had a transitional year at |
| 11 | Brandeis, a year enrolled in a day curriculum. | |
| 12 | Q. | What is a traditional year? |
| 13 | A. | Transitional year. I was undecided |
| 14 | whether I wanted to go into the military or | |
| 15 | college. They had a program that was a year long | |
| 16 | program. You take courses from the university to | |
| 17 | help you strengthen certain areas if you felt | |
| 18 | that you had weak areas. I did that for a year. | |
| 19 | Q. | You get credit for the first year |
| 20 | of a four year program? | |
| 21 | A. | Yes. |
| 22 | Q. | Did you ever go into the military? |
| 23 | A. | No. |
| 24 | Q. | What did you major in? |

Page 7

| | | |
|---|---|---|
| 1 | A. | Economics. |
| 2 | Q. | When did you graduate? |
| 3 | A. | 1989. |
| 4 | Q. | What did you do then? |
| 5 | A. | I went to work for Raytheon. |
| 6 | Q. | Doing what? |
| 7 | A. | I started as a vendor liaison. I |
| 8 | went through two years of a management program, | |
| 9 | and then I ended up as a sub-contractor | |
| 10 | administrator at Raytheon. | |
| 11 | Q. | What did you do after that? |
| 12 | A. | I left Raytheon and worked for |
| 13 | Boston Housing Authority as a police officer. | |
| 14 | Q. | Why did you leave Raytheon? |
| 15 | A. | I decided that I wanted to be a |
| 16 | police officer. It was something that I thought | |
| 17 | about for a period of time. | |
| 18 | Q. | How long were you with Boston |
| 19 | Housing? | |
| 20 | A. | October of 1995 to June of 1996. |
| 21 | Q. | Did you know Jeffrey Coy? |
| 22 | A. | No. The name does not ring a bell. |
| 23 | Q. | After that you became a Boston |
| 24 | police officer? | |

Page 8

| | | |
|---|---|---|
| 1 | A. | That's correct. |
| 2 | Q. | Have you ever been arrested? |
| 3 | A. | No. |
| 4 | Q. | Have you ever been complained |
| 5 | against as a police officer? | |
| 6 | A. | Yes. |
| 7 | Q. | How many times? |
| 8 | A. | Once. |
| 9 | Q. | With Internal Affairs? |
| 10 | A. | Yes. |
| 11 | Q. | What was the nature of that |
| 12 | Complaint? | |
| 13 | A. | They said that they were detained |
| 14 | an excessive amount of time. | |
| 15 | Q. | Detained for what? |
| 16 | A. | For an excessive period of time, I |
| 17 | believe. | |
| 18 | Q. | Were they arrested, these people? |
| 19 | A. | It wasn't my call. I was an |
| 20 | assist. I don't recall if they were arrested or | |
| 21 | not. | |
| 22 | Q. | What happened to this Complaint? |
| 23 | A. | It was unfounded. |
| 24 | Q. | Have you ever been disciplined by |

Page 9

| | | |
|---|---|---|
| 1 | your superiors? | |
| 2 | A. | No. |
| 3 | Q. | Or disciplined by the Boston |
| 4 | police? | |
| 5 | A. | No. |
| 6 | Q. | And what are your duties now? |
| 7 | A. | I'm assigned to the Drug Control |
| 8 | Unit. | |
| 9 | Q. | You were out on injured leave, were |
| 10 | you not? | |
| 11 | A. | Yes, I was. |
| 12 | Q. | Were you back? |
| 13 | A. | Yes, I am. |
| 14 | Q. | How long were you out? |
| 15 | A. | Almost a year. |
| 16 | Q. | Why were you out for a year? |
| 17 | A. | Broken pelvis. |
| 18 | Q. | How did that happen? |
| 19 | A. | An accident. |
| 20 | Q. | As a police officer? |
| 21 | A. | Yes. |
| 22 | Q. | On off-time? |
| 23 | A. | Yes. |
| 24 | Q. | What type of accident was that? |

3 (Pages 6 to 9)

Page 10

1  A.  Motorcycle accident.
2  Q.  It was your own private motorcycle?
3  A.  Yes.
4  Q.  Were you badly hurt?
5  A.  Yes, I was.
6  Q.  Are you all right now?
7  A.  Yes, I am.
8  Q.  Do you have any permanent injuries?
9  A.  No.
10 Q.  You're with the Drug Control Unit?
11 A.  Yes, that's correct.
12 Q.  How long have you been there?
13 A.  Four years.
14 Q.  Before that, where were you?
15 A.  I was assigned to area B2.
16 Q.  What did you do there?
17 A.  Initially I started in a Service
18 Unit and then an Anti-Crime Unit.
19 Q.  Service Unit?
20 A.  Yes.
21 Q.  What does that mean?
22 A.  One man car answering calls for any
23 issues, such as take a complaint, not a complaint
24 but a report, and assist other officers.

Page 11

1  Q.  And who is your commander in the
2  Drug Unit?
3  A.  Who are my supervisors?
4  Q.  Yes.
5  A.  Sergeant Detective Gerard Bailey.
6  Q.  How long has he been your
7  supervisor?
8  A.  Just recently, a few months, I
9  believe.
10 Q.  Who was your supervisor before
11 that?
12 A.  Sergeant Detective Linskey,
13 L-i-n-s-k-e-y.
14 Q.  Was Sergeant Feeney, F-e-e-n-e-y,
15 ever your supervisor?
16 A.  He was supervisor of Squad District
17 2, and for a period of time if we didn't have a
18 supervisor, he could have been our supervisor.
19 Q.  But only to replace your main
20 supervisor?
21 A.  Yes.
22 Q.  At the time of the incident in
23 question, Sergeant Feeney was not your
24 supervisor?

Page 12

1  A.  Yes, he was. He was the supervisor
2  that day.
3  Q.  He wasn't, however, your regular
4  supervisor?
5  A.  That's correct.
6  Q.  Who was your regular supervisor?
7  A.  Sergeant Detective Daniel Linskey.
8  Q.  Is there some reason that you're no
9  longer under his control?
10 A.  He is holding another position.
11 Q.  What position is that?
12 A.  Acting Chief for the Municipal
13 Police.
14 Q.  He left the Boston police?
15 A.  No, he is still a Sergeant
16 Detective, but he is Acting Chief over there.
17 Q.  At the Municipal Police?
18 A.  Yes.
19 Q.  That is a separate entity, is it
20 not?
21 A.  It's part of the City of Boston.
22 I'm not sure what the connection is.
23 Q.  How long has he been over there?
24 A.  For a few months.

Page 13

1  Q.  You're unit is out of what area?
2  A.  Area B2, the Roxbury-Dorchester
3  area.
4  Q.  Who are the other members of your
5  squad now?
6  A.  Now, it is Sergeant Detective
7  Gerard Bailey, Officer Paul Quinn, Officer
8  William Shaw, Detective Roy Fredericks, and
9  Officer Kent Hearns, and myself.
10 Q.  How long have you been working with
11 Officer Hearns?
12 A.  Four years.
13 Q.  Have you been partners with him or
14 was it just the same unit?
15 A.  Just the same unit.
16 Q.  Have you ever given information to
17 Internal Affairs relative to a sergeant other
18 than in that particular case?
19 A.  No.
20 Q.  Were you involved in the search of
21 a man named Lacy?
22 A.  No, I was not.
23 Q.  Are you familiar with that case?
24 A.  Yes, I am.

MARCUS EDDINGS
October 26, 2004

Page 14

1  Q.  You weren't on duty that night?
2  A.  No.
3  Q.  Now, turning your attention to the
4  point in question, you were on duty, were you
5  not, on March 20, 2003?
6  A.  Yes, I was.
7  Q.  You took part in a search at 58
8  Cheney Street?
9  A.  Yes.
10 Q.  Were you involved at all in
11 obtaining the same information for the affidavit
12 for a search warrant prior to going in?
13 A.  I don't understand.
14 Q.  I will rephrase that. Apart from
15 going in that night and being involved in an
16 actual search, were you involved in an
17 investigation as to whether or not there was drug
18 dealing in that apartment?
19 A.  Yes.
20 Q.  How were you involved?
21 A.  I participated in some of the
22 control buys.
23 Q.  Was Sergeant Feeney involved in the
24 preliminary investigation or were you doing that

Page 15

1  basically within your own group and regular
2  supervisor?
3  A.  Within our own group and regular
4  supervisor. I can't say that he didn't
5  participate in one or more of the buys. I don't
6  recall that.
7  Q.  You did some control buys in the
8  apartment before the search?
9  A.  I didn't make the buys; I
10 participated in control buys.
11 Q.  In what sense did you participate?
12 A.  Sometimes I would be stationed in a
13 certain area that we were going to make the
14 purchases from.
15 Q.  Who was the target?
16 A.  Roland Lugo, L-u-g-o.
17 Q.  Was anyone else the target of that
18 investigation?
19 A.  No.
20 Q.  Now, what role did you play in the
21 actual entry into that apartment, if any?
22 A.  My initial role was to make entry
23 through the rear part of the building.
24 Q.  Did you do so?

Page 16

1  A.  Yes, I did.
2  Q.  Was it a forced entry?
3  A.  It was not a forced entry.
4  Q.  You had a key?
5  A.  That's correct.
6  Q.  Who had the key?
7  A.  Officer Paul Quinn.
8  Q.  Where did you get the key?
9  A.  I didn't get the key. I believe
10 that he received it from management.
11 Q.  What did you see upon entering?
12 A.  What part of the entry are you
13 referring to?
14 Q.  As you entered. In other words,
15 the door was open, and --
16 A.  As I went through the apartment, my
17 first observation was of two males and a female
18 in the front part of the apartment.
19 Q.  Would that be the living room?
20 A.  Yes, it would be.
21 Q.  Did you know what Lugo looked like?
22 A.  Yes, I did.
23 Q.  How did you know that?
24 A.  I had seen a picture of him.

Page 17

1  Q.  Were preparations made with all the
2  members of the Drug Unit before the entry?
3  A.  Yes.
4  Q.  A picture was shown?
5  A.  Yes.
6  Q.  Only of Lugo?
7  A.  That's correct.
8  Q.  What about his sister, Jacqueline
9  Lugo?
10 A.  I don't recall seeing a picture of
11 her.
12 Q.  Was any mention made of her?
13 A.  No.
14 Q.  So you saw three people in the
15 non-bedroom and central room?
16 A.  At that time, I didn't know that it
17 wasn't a bedroom, but that's the room as you
18 entered the apartment.
19 Q.  Were other officers coming in from
20 another direction?
21 A.  No, not that I recall.
22 Q.  So what did you do when you
23 entered?
24 A.  I went to the rear of the

5 (Pages 14 to 17)

MARCUS EDDINGS
October 26, 2004

Page 18

1 apartment. I went to my left.
2  Q. Where did others go?
3  A. There were officers that stopped in
4 the front part of the apartment and myself. I'm
5 not sure who else, but I believe that another
6 officer came to the rear.
7  Q. What was your role?
8  A. Initially to secure the premises,
9 make sure that no one else was in the apartment
10 other than people that we saw when we initially
11 came in.
12  Q. Was there anyone else?
13  A. No.
14  Q. Did you have any contact with Lugo
15 yourself?
16  A. No.
17  Q. Did you see Lugo interact with any
18 police officer?
19  A. Yes, i did.
20  Q. What did you see?
21  A. I believe that it was Officer
22 Quinn. They initially approached him or went to
23 that area where he was.
24  Q. What did he do?

Page 19

1  A. After I went to the rear of the
2 apartment, I don't know.
3  Q. What did you see when you came back
4 from the rear?
5  A. I actually stayed in the rear and
6 was searching for a period of time.
7  Q. When you say "rear," do you mean
8 the bedroom?
9  A. No, the kitchen, and I searched the
10 bathroom.
11  Q. When you came back, when was the
12 next time that you saw Lugo, Roland Lugo?
13  A. I'm not sure how long a period of
14 time, but somewhere during the search, after I
15 had searched the bathroom and kitchen.
16  Q. Where did you see him?
17  A. Still in the front part of the
18 house in the living room area.
19  Q. Was he handcuffed?
20  A. I believe that he was.
21  Q. Was anyone doing anything to him?
22  A. I don't understand; doing what?
23  Q. Did you see him being searched at
24 any point?

Page 20

1  A. No, I did not.
2  Q. Did you hear anyone talk to him?
3  A. No.
4  Q. Did you see Jacqueline Lugo?
5  A. Yes.
6  Q. Where was she?
7  A. She was in a chair outside of the
8 living room area.
9  Q. What do you mean outside of the
10 living room area?
11  A. Like the living room is here.
12 There is a chair here. She is just on the
13 threshold of the living room.
14  Q. Was she handcuffed?
15  A. I don't believe that she was.
16  Q. Was the baby in the apartment?
17  A. Yes, there was.
18  Q. Where was the baby?
19  A. Beside her or she was holding him.
20 I'm not sure.
21  Q. Did you have any interaction with
22 her?
23  A. No.
24  Q. Did you hear her say anything?

Page 21

1  A. No.
2  Q. Did you see Lugo take any drugs
3 from this person?
4  A. No. You're referring to Rolando?
5  Q. Yes.
6  A. No.
7  Q. Do you know whether he was searched
8 or not?
9  A. Yes, I know that he was searched.
10  Q. What type of search was it?
11  A. I know that he was patted first.
12  Q. Was he strip-searched?
13  A. That I don't know.
14  Q. You assume that he was at least
15 patted first?
16  A. Yes, that's correct.
17  Q. Was Jacqueline Lugo patted first?
18  A. I don't know.
19  Q. Was there a woman officer with you?
20  A. Not during the initial entry.
21  Q. Was she called in at any point?
22  A. I'm not sure.
23  Q. Now, you saw a third individual
24 there?

6 (Pages 18 to 21)

MARCUS EDDINGS
October 26, 2004

Page 22

1  A. Yes.
2  Q. What was his name?
3  A. Ivan Santiago.
4  Q. Did you have any interaction with
5  him?
6  A. Yes, I did.
7  Q. When was the first time that you
8  had interaction with him?
9  A. When I went to search him.
10 Q. Had he been handcuffed initially?
11 A. Yes, I believe that he was.
12 Q. Who handcuffed him?
13 A. That I don't know.
14 Q. What is the procedure normally for
15 whether or not someone in the apartment being
16 searched is handcuffed?
17 A. Usually everyone is handcuffed
18 initially for safety purposes.
19 Q. Automatically everyone is
20 handcuffed?
21 A. Yes, that's correct.
22 Q. Regardless of whether or not there
23 is any reason to believe they were involved in
24 drug activity?

Page 23

1  A. That's correct.
2  Q. Do you know whether Jacqueline was
3  handcuffed?
4  A. That I don't know.
5  Q. Was he sitting on the couch in the
6  living room?
7  A. Yes, he was.
8  Q. Did you have any conversation with
9  him?
10 A. Initially, no.
11 Q. Did you check his record?
12 A. Did I check his record?
13 Q. Yes. Did anyone, if you know?
14 A. I believe that there was a warrant
15 check on him, yes.
16 Q. That is the customary procedure?
17 A. Yes, it was.
18 Q. For anyone in the apartment that
19 was searched?
20 A. Yes, that's correct.
21 Q. What did that turn up, if you know?
22 A. I believe that he had no warrant.
23 Q. Now, how did it come about that you
24 had an interaction with him?

Page 24

1  A. It was determined that he hadn't
2  been searched.
3  Q. How was that determined?
4  A. I believe that someone asked if he
5  had been searched.
6  Q. What do you mean by "searched"?
7  What type of search?
8  A. For evidence of narcotics.
9  Q. For drugs?
10 A. Yes.
11 Q. Are you assuming that he was
12 frisked first?
13 A. Yes, that's correct.
14 Q. So you're not talking about frisk
15 search?
16 A. That's correct.
17 Q. Something beyond frisk search?
18 A. That's correct.
19 Q. Did someone say something that led
20 you to search him?
21 A. Yes. It was determined he had not
22 been searched.
23 Q. By whom?
24 A. There was a question asked, I

Page 25

1  believe, that he had been searched.
2  Q. Who asked the question?
3  A. That I don't recall. That I don't
4  know.
5  Q. Was it assumed that he had to be
6  searched if he was in the apartment?
7  A. Yes.
8  Q. Are you saying that you searched
9  everybody who is in an apartment where there is a
10 warrant to search regardless of whether there was
11 any information that person was involved?
12 A. If the affidavit allows you to,
13 yes.
14 Q. So you're saying if the affidavit
15 says search everyone in the apartment, you
16 believe that gives you authority to search
17 anybody in the apartment regardless of whether
18 there is any particular knowledge of drug
19 activity on their part?
20 A. All persons present.
21 Q. You have been trained that you have
22 authority to search all persons present if the
23 warrant says that?
24 A. Yes.

7 (Pages 22 to 25)

Page 26

1  Q. Where did you receive this
2  training?
3  A. Trained in the department. It's
4  just information that I have learned since I have
5  been in the Drug Unit.
6  Q. What type of search does that
7  authorize?
8  A. You can search the person; you can
9  do a strip-search.
10 Q. So you believe if a warrant says
11 that you can search anyone in the apartment that
12 gives you authority to strip-search anyone in the
13 apartment?
14 A. Yes.
15 Q. Where did you learn that?
16 A. All persons present. Let's put it
17 that way. You can search them, and if you have
18 reason to believe that you need to strip-search
19 them, you can strip-search them.
20 Q. You're distinguishing between
21 search and strip-search?
22 A. Yes. A strip-search is you're
23 requesting the person to remove certain articles
24 of clothing.

Page 27

1  Q. How do you define a strip-search?
2  A. Removing articles of clothing.
3  Q. Any articles?
4  A. Yes, any articles.
5  Q. What type of search falls short of
6  having people remove articles of clothing?
7  A. Searching their pockets, pants
8  pockets, jacket pockets.
9  Q. Another search short of that type
10 of search is a frisk?
11 A. Pat frisk.
12 Q. You don't go into the pockets; you
13 just pat for weapons?
14 A. That's correct.
15 Q. In this case someone asked has he
16 been searched?
17 A. That's correct.
18 Q. You don't know whether he had?
19 A. At that time, no.
20 Q. So when that question was asked,
21 did anyone answer?
22 A. I don't know. I don't believe that
23 anyone answered specifically? I believe it was
24 determined that he had not been searched.

Page 28

1  Q. Do you know how this determination
2  was made that no one had searched him.
3  A. I hadn't searched him. Someone
4  else hadn't searched him. It was determined that
5  he wasn't searched. It was determined that he
6  had not been searched.
7  Q. What did you do at that point?
8  A. I walked into the bathroom.
9  Q. Why did you do that?
10 A. To search him.
11 Q. Did someone order you to search
12 him?
13 A. No.
14 Q. You just did it on your own?
15 A. Yes.
16 Q. Why did you take him into the
17 bathroom?
18 A. So that I could search him.
19 Q. Were you intending all along to
20 strip-search him?
21 A. Yes.
22 Q. Why were you intending to do a
23 strip-search?
24 A. It had been determined from

Page 29

1  investigation that the target of the
2  investigation had removed drugs from his buttocks
3  area.
4  Q. Why did that mean you should
5  strip-search Mr. Santiago?
6  A. One of the things that occurred
7  prior to entering the apartment was that it was
8  compromised by the female who told Ivan and
9  Rolando that we were coming to do a raid.
10 Q. Did you have any information that
11 Ivan Santiago was involved in drug dealing?
12 A. No.
13 Q. Now what role did Officer Feeney
14 play in having you strip-search this individual,
15 if any?
16 A. He was the supervisor in charge of
17 the scene.
18 Q. Did he know that you were going to
19 strip-search him?
20 A. I believe that he knew that I was
21 going to search him.
22 Q. No, strip-search him?
23 A. I would say, yes.
24 Q. What made you think that he knew

8 (Pages 26 to 29)

MARCUS EDDINGS
October 26, 2004

### Page 30

1  you were going to strip-search him?
2     A.   Just her giving warning that prior
3  to entry they were being raided, and the fact
4  that Mr. Lugo had drugs in his buttocks area.
5     Q.   So you thought that based on those
6  facts, you had a right to strip-search Mr.
7  Santiago?
8     A.   Yes.
9     Q.   Do you believe that established
10 probable cause that he had secreted drugs on his
11 person?
12    A.   That's correct.
13    Q.   The fact she had screamed out,
14 "They are coming," gave you probable cause to
15 believe that Santiago had drugs secreted on his
16 person?
17    A.   It was the totality of the
18 circumstances.
19    Q.   Just because Lugo took drugs from
20 his rear you believe gave you probable cause,
21 together with other facts, to search Mr. Santiago
22 in that manner?
23    A.   To strip-search him, yes.
24    Q.   Once again, other than those two

### Page 31

1  facts, you had no grounds to believe he was
2  involved in drug dealing, do you?
3     A.   He wasn't the target of the
4  investigation.
5     Q.   Now, what did you do? Was he
6  handcuffed when you took him into the bathroom?
7     A.   Yes, he was.
8     Q.   What happened when you got him
9  there?
10    A.   When we entered the bathroom, I
11 told him I was going to search him. I said, "I'm
12 going to take the cuffs off. We don't want any
13 problem." I said, "I'm going to ask you to take
14 off an article of clothing."
15    Q.   You took the cuffs off?
16    A.   Yes, after I told him that I was
17 going to take them off. It's easier for a person
18 to hand you the articles so you can inspect the
19 articles without risking your safety.
20    Q.   But you're more in jeopardy if he
21 is not handcuffed than if he is handcuffed?
22    A.   Yes, that's correct.
23    Q.   But, nevertheless, you handled it
24 that way?

### Page 32

1     A.   Yes.
2     Q.   Why didn't you order a search into
3  his pockets before taking him into the bathroom?
4     A.   Because I believed that he was
5  patted first. And once he hands me the article
6  of clothing, I'm going to search the pockets
7  anyway.
8     Q.   Tell me how the search is done, how
9  it went.
10    A.   Me personally, I start from the
11 bottom up. I ask him to give me a shoe. I
12 inspect the shoe. I ask him to give me the
13 socks. I ask him to give me the other shoe and
14 so forth, and I work my way all the way up.
15    Q.   He takes off his own clothes?
16    A.   Yes.
17    Q.   You had him take off every strip of
18 clothing?
19    A.   Yes.
20    Q.   That is customary practice in all
21 searches of apartments?
22    A.   All searches, no.
23    Q.   Your position is that you were
24 doing this on your own? No one told you to

### Page 33

1  strip-search?
2     A.   No.
3     Q.   But it was your impression that
4  your supervisor knew you were going to do it, and
5  he didn't tell you not to?
6     A.   That's correct.
7     Q.   What made you think that he knew
8  that you were going to do the strip-search?
9     A.   Again, based on the totality of the
10 circumstances where we had an individual that had
11 drugs in his buttocks area.
12    Q.   No. I'm saying what made you think
13 that Feeney knew you were going to do it?
14    A.   What made me think I was going to
15 do it is because that individual had not been
16 searched. I took him from the living room area.
17 I took him to the bathroom to be searched.
18    Q.   Wasn't a statement made by some
19 officers that were leaving with Lugo to the
20 effect that you should search this guy?
21    A.   Not that I should search him. The
22 comment was had he been searched. The basis of
23 finding out if he had been searched or not was so
24 someone could search him if he wasn't.

MARCUS EDDINGS
October 26, 2004

### Page 34

1  Q. Since the term "strip-search"
2  wasn't used, why did you think that you had a
3  right to strip-search him when someone asked had
4  he been searched, rather than just doing a normal
5  in-pocket search?
6  A. I don't understand.
7  Q. Let me rephrase that. You said
8  that you did the strip-search because of certain
9  factors.
10  A. That's right.
11  Q. One was that Lugo, who was the
12  object of the search, took some drugs from his
13  rear end?
14  A. Yes.
15  Q. Another factor was that before you
16  came in, the woman screamed, "The police are
17  coming"?
18  A. That's correct.
19  Q. Are there any other factors other
20  than those two that were the basis for you doing
21  the strip-search?
22  A. This is how it works. We are doing
23  a search warrant at this location. We get in and
24  we have this individual there. We secured the

### Page 35

1  individual. The fact that it was compromised
2  when we were coming in by warning Rolando and
3  Ivan, finding and telling them we were coming in
4  to raid the place, giving more awareness they
5  know what was going on inside the apartment.
6      Then we get inside the apartment,
7  and one individual removes drugs from his buttock
8  area, and --
9  Q. That's the guy you knew was the
10  subject of the search and that he was a drug
11  dealer?
12  A. That's correct. After this point
13  it was determined that Mr. Santiago had not been
14  searched. So at that point it was determined
15  that he needed to be searched, and I searched
16  him.
17  Q. Someone said, "Has he been
18  searched"?
19  A. It was determined that he had not
20  been searched.
21  Q. How did you know that?
22  A. Someone asked the question. They
23  were wondering if he was being placed under
24  arrest. That led to, "Has he been searched?"

### Page 36

1  So, I took him to the bathroom and searched him.
2  Q. And it was your decision to take
3  him to the bathroom to be searched as opposed to
4  just searching him out there in the living room
5  area?
6  A. That's correct.
7  Q. You made that decision because you
8  assumed that your superiors wanted you to
9  strip-search him?
10  A. It's not an assumption; he has to
11  be searched.
12  Q. Are you saying that he had to be
13  strip-searched or had to be searched?
14  A. The strip-search was based on the
15  facts, the totality of the circumstances that
16  occurred, and so I'm not going to strip-search
17  him in an open area.
18  Q. What is the test for determining
19  whether or not you're allowed to do a
20  strip-search under the regulations of the Boston
21  Police Department?
22  A. You have to have a certain level of
23  probable cause.
24  Q. You have to have probable cause?

### Page 37

1  A. That's correct.
2  Q. Do you believe that you had
3  probable cause to strip-search this individual?
4  A. Absolutely, yes.
5  Q. You had no information at all other
6  than a hunch that he might have drugs?
7  A. If he had drugs on his person, it's
8  not a hunch.
9  Q. You had absolutely no information
10  that Ivan Santiago was a drug dealer, did you?
11  A. That's correct.
12  Q. During your investigation prior to
13  going in, you had no information that Santiago
14  was involved in drug dealing coming out of that
15  apartment?
16  A. That's correct.
17  Q. The only thing that you had going
18  for you in establishing that there was any
19  possible basis of probable cause were the two
20  factors that you mentioned?
21  A. You're saying two factors. I'm
22  going on the experience that I had that day, the
23  totality of everything that happened. You're
24  calling it two factors and I'm saying it's the

10 (Pages 34 to 37)

MARCUS EDDINGS
October 26, 2004

Page 38

1  process of the events that took place.
2     Q.   You never saw him make any moves to
3  suggest that he was trying to hide drugs, did
4  you?
5     A.   No I did not.
6     Q.   You checked the record and there
7  was no indication that he was a drug dealer from
8  checking the records, was there?
9     A.   A warrant check doesn't give you a
10 history of his record.
11    Q.   You're not saying that you did the
12 search because in checking his history you found
13 he had a history of drug dealing and that gave
14 you probable cause to search him?
15    A.   No, we didn't do a history check.
16    Q.   So you didn't have the information?
17 You had no information? You do check the record
18 sometimes to see if he has a record, don't you?
19    A.   Yes. While we are at the scene, we
20 check to see if he is on the warrant.
21    Q.   It's on the warrant and not the
22 record?
23    A.   You get the individual's name and
24 date of birth. You asked whether he has any

Page 39

1  outstanding warrants. That doesn't give you a
2  list of everything he has done in the past.
3     Q.   You don't check to see if he has
4  any history of drug dealing?
5     A.   No.
6     Q.   In any event, that wasn't the basis
7  of the search?
8     A.   No.
9     Q.   So you had no specific knowledge
10 that he had drugs on him, did you?
11    A.   That's correct.
12    Q.   Now, was he under arrest?
13    A.   At that time?
14    Q.   Yes.
15    A.   No.
16    Q.   Was he under arrest that night?
17    A.   No, he was not placed under arrest.
18    Q.   It's your position that you're
19 allowed to strip-search someone who has not been
20 put under arrest?
21    A.   That's correct.
22    Q.   That is done all of the time in
23 drug searches?
24    A.   No, from time to time.

Page 40

1     Q.   It's not a problem for you, even
2  now, when you go into a house to do a drug search
3  to strip-search someone that hasn't been
4  arrested?
5     A.   That's correct.
6     Q.   But if you have probable cause that
7  someone had drugs on their person, you have a
8  basis to arrest them, don't you?
9     A.   You have probable cause to search.
10    Q.   If you have probable cause to
11 search, you have probable cause to arrest, don't
12 you?
13    A.   I would say so.
14    Q.   Why didn't you arrest Mr. Santiago,
15 in this case, if you had probable cause to
16 search?
17    A.   We had probable cause to search.
18 It was determined that Mr. Santiago didn't have
19 any drugs on him. After the search, he was
20 recuffed, and I walked back to the living room,
21 and it was determined that he was not to be
22 arrested.
23    Q.   It's your position that you could
24 have arrested him without strip-searching him and

Page 41

1  taking him to the station, but you chose to do it
2  this way, and that once you found nothing on him,
3  you didn't have to arrest him?
4     A.   That's correct.
5     Q.   Was he ever in custody?
6     A.   What do you mean by "custody"?
7     Q.   As the term is used in police
8  regulations.
9     A.   He was detained. I'm not sure
10 about custody. The way that you're saying it to
11 me means he was under arrest, and he was not
12 under arrest.
13    Q.   Has there been a policy change in
14 the Drug Unit relative to strip-searches after
15 the complaint made by Mr. Santiago?
16    A.   Not that I'm aware of, no.
17    Q.   So you would have no problem in
18 strip-searching an individual such as Mr.
19 Santiago under similar circumstances that
20 presented themselves in this case at issue?
21    A.   That's correct.
22    Q.   Once he had his clothes off, what
23 did you do to the individual?
24    A.   I asked him to lift up his scrotum,

11 (Pages 38 to 41)

MARCUS EDDINGS
October 26, 2004

Page 42

1  so I could look at his scrotum. I asked him to
2  turn around.
3    Q.  What was the purpose of that?
4    A.  Sometimes individuals will tape
5  things down there. They try to conceal things
6  there. You're standing there, and normally you
7  wouldn't see it.
8       So then I asked him to turn around
9  and to spread his butt cheeks.
10   Q.  Wasn't he asked to bend forward?
11   A.  Yes.
12   Q.  You don't feel uncomfortable to
13 have another individual take his clothes off,
14 lift up his scrotum, bend over and show you his
15 rear end, when you have no evidence this person,
16 this particular individual, had drugs on his
17 person.
18      MR. COX: Objection.
19   A.  I believed that he could have drugs
20 on his person.
21   Q.  You believed that, and that allows
22 you to do such an invasive search without any
23 specific knowledge other than what you described?
24   A.  You just have to have probable

Page 43

1  cause. You don't have to have specifics. It's
2  just probable cause.
3    Q.  You believe that you had probable
4  cause simply because he was in the apartment?
5    A.  Not simply that he was in the
6  apartment, but it was the totality of the
7  circumstances.
8    Q.  There was nothing to indicate that
9  he had drugs on his person other than being in
10 the apartment, did he?
11   A.  I had no specifics that he had
12 drugs, no.
13   Q.  Did you ask him if he had any
14 relationship with anyone of the other parties?
15   A.  I did not, no.
16   Q.  Do you know if anyone else did?
17   A.  I am not sure.
18   Q.  Have you done a strip-search before
19 in the process of doing a search in an apartment?
20   A.  Yes.
21   Q.  On how many occasions?
22   A.  I honestly don't know.
23   Q.  Approximately.
24   A.  In four years, I don't know. Me

Page 44

1  personally, maybe half a dozen to a dozen times;
2  I'm not sure.
3    Q.  Have you ever done a cavity-search?
4    A.  No.
5    Q.  Never at any time?
6    A.  I have never done a cavity-search.
7    Q.  Has a cavity-search ever been done
8  while you were in the process of a search by
9  someone else?
10   A.  No, not that I know of.
11   Q.  Have you ever seen a cavity-search
12 done?
13   A.  No.
14   Q.  Have you ever heard of a
15 cavity-search being done?
16   A.  No. I have, of course, heard of a
17 cavity-search if that is your question.
18   Q.  Why did you do one that night?
19   A.  I didn't do it that night.
20   Q.  Mr. Santiago claims that you did a
21 cavity-search.
22   A.  Mr. Santiago is wrong.
23   Q.  You stuck your finger up his rear
24 end.

Page 45

1    A.  No, I did not.
2    Q.  Do individuals sometimes put stuff
3  up their rectum?
4    A.  Yes.
5    Q.  What do you do if you believe that
6  someone has put something up his rectum?
7    A.  You would notify a supervisor, and
8  they would make a determination to get the Judge
9  to get a search warrant. This person would be
10 transported to the hospital, and it would be done
11 by a doctor.
12   Q.  Has that ever been done where you
13 knew a search warrant was obtained by the Judge
14 to do a cavity-search?
15   A.  Yes.
16   Q.  On how many occasions?
17   A.  Once.
18   Q.  Just one time in four years?
19   A.  One time.
20   Q.  What were the circumstances in this
21 case?
22   A.  I don't know the exact details
23 about how they found the information of what was
24 in the individual's body. If they do it, they

12 (Pages 42 to 45)

MARCUS EDDINGS
October 26, 2004

Page 46

1  seek a warrant, and that person is then
2  transported, I believe, to Boston Medical.
3      Q.   Have you ever seen a search warrant
4  that specifically authorized a strip-search
5  before you went into this apartment?
6      A.   That authorized a strip-search?
7      Q.   Yes.
8      A.   As opposed to just a general
9  search, no.
10     Q.   Now, when was the last time that
11 you received training in strip-searches?
12     A.   I'm not sure.
13     Q.   Are you aware that strip-search
14 regulations were issued in 1999?
15     A.   Yes.
16     Q.   What was the policy before that?
17     A.   Before 1999?
18     Q.   Yes, that's right.
19     A.   That I'm not sure about; I don't
20 recall it.
21     Q.   Have you ever done any
22 strip-searches at the station house?
23     A.   Yes.
24     Q.   And under what circumstances did

Page 47

1  you do a strip-search at the station house?
2      A.   You would have to have probable
3  cause. You would notify the duty supervisor or
4  request it from the duty supervisor. You would
5  have to state the facts why you believed that
6  this person is to be strip-searched. They would
7  say yes or no.
8      Q.   But when you're out at the
9  apartment pursuant to a search warrant, you don't
10 have to go to the duty supervisor to get
11 permission?
12     A.   No.
13     Q.   That is your understanding of the
14 regulations?
15     A.   That is my understanding, yes.
16     Q.   Do you know why there was no
17 indication in the Incident Report that such a
18 strip-search had taken place.
19     A.   No.
20     Q.   Is that supposed to be the case --
21     A.   Yes, it is.
22     Q.   Let me finish the question. Is
23 this supposed to be the case in the Incident
24 Report, that the strip-search is done?

Page 48

1      A.   Yes, it is.
2      Q.   Why is that?
3      A.   It's part of the rules and
4  regulations.
5      Q.   But you don't have to indicate in
6  an Incident Report just a frisk?
7      A.   Just a frisk, no.
8      Q.   Or an ordinary search into the
9  pockets?
10     A.   No.
11     Q.   But a strip-search you're supposed
12 to indicate it?
13     A.   Yes.
14     Q.   Who made out the employee's report?
15     A.   I believe it was Officer Paul
16 Quinn?
17     Q.   And you don't know why he didn't
18 put it in there?
19     A.   Probably just an error of not
20 putting it in.
21     Q.   Do you know whether he even knew
22 there was a strip-search?
23     A.   Yes.
24     Q.   Paul Quinn knew there was?

Page 49

1      A.   I believe he did, yes.
2      Q.   He wasn't your supervisor; he was
3  just another person on your squad?
4      A.   Another person on the squad, yes.
5      Q.   How would he know?
6      A.   Because I indicated that I searched
7  him.
8      Q.   And that you went into the
9  bathroom?
10     A.   That's correct.
11     Q.   You wouldn't go into the bathroom
12 for an ordinary search?
13     A.   That's correct.
14     Q.   When you went to do the search,
15 some of the officers had already left?
16     A.   I believe so, yes.
17     Q.   How would you know Paul Quinn knew
18 you did a strip-search, if it was at the very
19 tail end and Lugo had been taken out?
20     A.   Paul was asking on the search
21 warrant, and he was the last person to leave.
22     Q.   He was there when you came in with
23 Lugo?
24     A.   I believe so, yes.

MARCUS EDDINGS
October 26, 2004

### Page 50

1  Q. Who else was there at that point?
2  A. Myself, Sergeant Feeney, and
3  Officer Quinn. I'm not sure who else.
4  Q. So Feeney knew you had done a
5  strip-search?
6  A. Yes.
7  Q. And a recommendation of discipline
8  has been levied against him based on his failure
9  to put that in the report, has it not?
10 A. That's correct.
11 Q. Is he still on duty?
12 A. Yes, he is.
13 Q. Has he had a hearing?
14 A. That I don't know.
15 Q. Now, before this Complaint from
16 Internal Affairs, was it common practice not to
17 put in the police report that there has been a
18 strip-search?
19 A. No.
20 Q. So normally it's been put in the
21 Police Report when there is a strip-search?
22 A. We put it in the report, yes.
23 Q. For some reason, in this case it
24 wasn't?

### Page 51

1  MR. COX: Objection.
2  A. It was not in the report.
3  Q. (By Mr. Hrones) Was Rolando
4  strip-searched?
5  A. That I don't know.
6  Q. Wasn't it common practice that if
7  he was the subject of the search that he was
8  strip-searched?
9  A. I would say, yes.
10 Q. But he didn't search him? There is
11 no indication in this report whether he was
12 strip-searched?
13 A. No, there isn't.
14 Q. To this day, do you know whether he
15 was strip-searched?
16 A. No.
17 Q. Do you know the circumstances of
18 his volunteering to take drugs from his rear end?
19 A. No.
20 Q. Now, what are your hobbies?
21 A. My hobbies?
22 Q. Yes.
23 A. Martial arts.
24 Q. Now, are you still training in

### Page 52

1  martial arts?
2  A. No. I haven't practiced in a
3  while.
4  Q. When was the last time that you
5  practiced?
6  A. Three or four years ago. I don't
7  know.
8  Q. Was that apart from your police
9  duties, a hobby?
10 A. Yes, separate.
11 Q. What about dog training; is that
12 one of your hobbies?
13 A. Yes, it is. Now I haven't done
14 that in a while.
15 Q. What does dog training mean?
16 A. Teach obedience.
17 Q. To your own private home dog?
18 A. Yes.
19 Q. Now, when you came back after you
20 searched him, did you handcuff him again?
21 A. Yes, I did.
22 Q. Why was that?
23 A. It still hadn't been determined
24 whether he was going to be placed under arrest.

### Page 53

1  Even though he had no drugs, basically it was up
2  to Feeney and the supervisor whether he was going
3  to be placed under arrest or not.
4  Q. On what basis would there be to
5  place him under arrest, if you found no drugs on
6  him?
7  A. Ammunition found in the apartment,
8  drugs found in the apartment, and there were
9  other items.
10 Q. You had no basis to tie that to
11 him.
12 A. I had no basis?
13 Q. Yes.
14 A. Yes. He would have been placed
15 under arrest. There was probable cause to
16 believe that he was a participant in the illegal
17 activity that was going on.
18 Q. What basis for probable cause did
19 you have, to believe that he was a participant in
20 illegal activity, his presence there?
21 A. No, the totality. Why would
22 somebody be warning you of a raid about to take
23 place in the apartment?
24 Q. She would be warning her brother,

14 (Pages 50 to 53)

MARCUS EDDINGS
October 26, 2004

Page 54

1  Lugo. That doesn't mean that Santiago was
2  involved, does it?
3      A.  Not necessarily, but it's
4  reasonable to believe it.
5      Q.  What is that, "The police are
6  coming"?
7      A.  No. She yelled to him by name that
8  the police were coming.
9      Q.  Well, in a minority community,
10 wouldn't that be understandable and common?
11     A.  That's not true. I grew up in a
12 minority community. If I had to base it on my
13 experience with my mother --
14     Q.  So you're saying that minority
15 communities welcome the police when they invade a
16 house and search it?
17         MR. COX: Objection.
18     A.  Why wouldn't they?
19     Q.  What time of night was this?
20     A.  This was in the morning.
21     Q.  What exactly did she yell out?
22     A.  I don't remember the exact words,
23 but she called them by name, and she said, "They
24 are raiding; they are raiding."

Page 55

1      Q.  You were raiding?
2      A.  Yes, we were.
3      Q.  So she was just telling them the
4  truth?
5      A.  That's true.
6      Q.  So it was your decision that the
7  bathroom door was closed when you put handcuffs
8  on him after the search?
9      A.  No, it was not completely closed.
10     Q.  But closed enough to give him
11 privacy?
12     A.  Yes.
13     Q.  You leave it open just a little
14 bit?
15     A.  That's correct.
16     Q.  So you made a decision yourself to
17 put him back in cuffs?
18     A.  That's what I normally do, yes.
19     Q.  Because you believed there was a
20 probable cause, even at this point, to take away
21 his liberty?
22     A.  That's correct.
23     Q.  When you brought him outside, why
24 didn't you take him to the police station?

Page 56

1      A.  I brought him up front, and we
2  didn't find anything, and then we needed to make
3  a determination if he was going to be placed
4  under arrest or not.
5      Q.  He was already under arrest, wasn't
6  he?
7      A.  He wasn't under arrest at that
8  time.
9      Q.  He is in handcuffs?
10     A.  Yes. Everybody is placed in cuffs
11 at the onset, for safety purposes.
12     Q.  But you're saying this went beyond
13 that. He was in cuffs at this point because you
14 believe that you had probable cause to arrest
15 him?
16     A.  That's correct.
17     Q.  It wasn't your decision to decide
18 to release him?
19     A.  No, it wasn't.
20     Q.  Whose decision was it?
21     A.  I don't know who made the final
22 decision, but it was determined that he was not
23 being placed under arrest.
24     Q.  Did you say anything to him, to Mr.

Page 57

1  Santiago?
2      A.  I told him what was going to be
3  taking place in the bathroom, yes.
4      Q.  Did you apologize to him?
5      A.  For what?
6      Q.  After you found nothing on him.
7      A.  No.
8      Q.  You didn't feel uncomfortable that
9  this person was arrested and strip-searched, and
10 you found nothing on him?
11     A.  It's not something that I like to
12 do. It's just not natural.
13     Q.  But you're a little less
14 uncomfortable strip-searching a drug dealer such
15 as Lugo who was the object of the search?
16     A.  I don't hold any feelings in any
17 particular regard. It's one thing to say -- I
18 thought I had probable cause, and because of that
19 I strip-searched him, and I didn't think I had to
20 apologize.
21     Q.  You're saying that even after you
22 found nothing on this person that just happened
23 to be in the apartment, you still didn't
24 apologize for that invasion of his dignity?

CATUOGNO COURT REPORTING SERVICES
Springfield, MA   Worcester, MA   Boston, MA   Providence, RI   Manchester, NH

MARCUS EDDINGS
October 26, 2004

Page 58

1      MR. COX: Objection.
2   A.   I don't think that I apologized to
3  him, no.
4   Q.   (By Mr. Hrones) You don't think
5  that he deserved an apology?
6   A.   I actually never thought about it.
7   Q.   Now is Sergeant Feeney still the
8  head of the Drug Unit?
9   A.   He is not head of the Drug Unit; he
10 is the supervisor.
11  Q.   Supervisor of one of the squads?
12  A.   Yes.
13  Q.   Who is the head of the Drug Unit
14 for the Boston police?
15  A.   Deputy Superintendent Fitzgerald.
16  Q.   How long has he been in that
17 position?
18  A.   A couple of months, I believe.
19  Q.   Before that?
20  A.   It was Lieutenant Armstrong. I
21 believe that Lieutenant Armstrong was the
22 commander.
23  Q.   Where is he now?
24  A.   He got a promotion. He is Captain

Page 59

1  now of Internal Affairs.
2   Q.   In your interrogation, you had an
3  attorney named Anderson; isn't that correct?
4   A.   Yes.
5   Q.   Who is that?
6   A.   He is the union attorney.
7   Q.   What is his first name?
8   A.   Kenneth.
9   Q.   Now, did you have gloves on that
10 night?
11  A.   Yes.
12  Q.   Why did you have gloves on?
13  A.   I wear gloves all of the time.
14  Q.   Where did you get the gloves?
15  A.   In the station.
16  Q.   They are issued by the station?
17  A.   Yes. They are not issued; they are
18 available.
19  Q.   You're required to use them if
20 you're involved in the search of an apartment?
21  A.   No.
22  Q.   Do most of the officers use them as
23 a matter of course.
24  A.   I know that I try to always use

Page 60

1  them.
2   Q.   Why do you use them?
3   A.   Because you're searching houses.
4   Q.   Why do you need gloves?
5   A.   Just the nature of things. You're
6  picking up stuff, and it's more sanitary.
7   Q.   What did you do with the gloves
8  that you used that night?
9   A.   I don't recall. I either left them
10 or I discarded them in the trash can.
11  Q.   Is there any policy about whether
12 you should leave the gloves in the apartment you
13 searched?
14  A.   No.
15  Q.   Sometimes you leave these dirty
16 gloves in the apartment?
17  A.   That's correct.
18  Q.   Do you remember someone saying, "Is
19 he staying or is he going," when Lugo was being
20 taken out?
21  A.   I'm not sure if those are the exact
22 words, but that is how we determine whether Mr.
23 Santiago needed to be searched or not.
24  Q.   Now, I think that I asked this

Page 61

1  before, but I'm not sure I got an answer. When
2  was the last time that you were trained in
3  strip-searching policy?
4   A.   I am really not sure.
5   Q.   Has there been any training with
6  regard to strip-searching since the academy?
7   A.   I had training at the Drug
8  Enforcement Administration. I also had training
9  with the Federal Bureau of Investigation, the
10 FBI.
11  Q.   Relative to strip-search?
12  A.   No, drug investigation in general.
13  Q.   This didn't deal specifically with
14 strip-search?
15  A.   Not specifically, no.
16  Q.   You didn't have any instructions at
17 that seminar relative to strip-searches?
18  A.   No.
19  Q.   So when was the last time that you
20 did have any specific training about
21 strip-searches?
22  A.   They discussed that, those two
23 agencies. As far as the department, I'm not sure
24 when was the last time I had training on that.

16 (Pages 58 to 61)

MARCUS EDDINGS
October 26, 2004

Page 62

1  Q. When was the training in those two
2  agencies?
3  A. I think that the Drug Enforcement
4  Administration was probably four years ago, and
5  the Federal Bureau of Investigation, I'm not
6  exactly sure, but I would say two years ago or
7  longer.
8  Q. What was the purpose of the FBI
9  training? Was it a training, or a seminar, or
10 what was it and for how long?
11 A. I would say that I was there for a
12 week. I think that it was a week.
13 Q. What was the purpose of it?
14 A. It was an ongoing training that
15 tries to bring you up on current things going on
16 as far as narcotics. They inform you about new
17 types of drugs, new forms of delivery, how to be
18 a better undercover officer, a whole gamut of
19 things.
20 Q. You don't remember a specific
21 instruction on strip-searches?
22 A. No.
23 Q. Now, if there is to be a
24 cavity-search, do you need a different standard

Page 63

1  of -- do you employ a different standard of
2  probable cause than you would for a regular
3  strip-search?
4  A. Yes. You're supposed to be at a
5  higher level of probable cause.
6  Q. Now, was it your understanding that
7  you have authority to do a strip-search on the
8  street if you have probable cause?
9  A. I have never done it on the street,
10 no.
11 Q. Do you have authority to do it if
12 you have probable cause?
13     MR. COX: Objection.
14 A. I have never come across that. I
15 have never had to do that.
16 Q. Have you ever seen that done by
17 anyone on the squad?
18 A. No.
19 Q. Now, who told you that the general
20 authority in a standard warrant to search anyone
21 in the apartment authorized a strip-search?
22 A. Who told me?
23 Q. Yes.
24 A. It's marked on the warrant that all

Page 64

1  persons present --
2  Q. Can be searched?
3  A. Yes.
4  Q. It doesn't mention strip-searched?
5  A. No.
6  Q. What is the basis for your
7  conclusion that authorized a strip-search if
8  there is probable cause?
9  A. It gives you authority if there is
10 probable cause to search all persons present.
11 Q. It says it gives you authority to
12 search.
13 A. That's right.
14 Q. But it doesn't say anything about
15 strip-search?
16 A. No, it doesn't say anything about
17 strip-search.
18 Q. What makes you think that you have
19 authority to strip-search in light of that type
20 of language in the warrant?
21 A. I have authority to search all
22 persons present.
23 Q. Right.
24 A. Then we had probable cause to

Page 65

1  search this individual. Once you have probable
2  cause to search an individual, if you can
3  articulate why you believe that they may be
4  secreting drugs, you conduct a strip-search.
5  Q. Were you trained that way, or is
6  that your own conclusion whether or not you can
7  do a strip-search?
8  A. That is how you are trained. You
9  have to have probable cause to search a person,
10 to begin with, like I said. If you're
11 strip-searching somebody back at the station, you
12 have to articulate to the deputy officer that
13 person has to be strip-searched.
14 Q. Why do you have this standard? Is
15 it your opinion that you don't have to ask your
16 supervisor, but you can do it on your own.
17 A. You have a supervisor in charge.
18 Q. You didn't have to ask him,
19 specifically, but you just went and did it in
20 this case; didn't you?
21 A. No, I did not ask.
22 Q. You are familiar with regulation
23 318D relative to strip-search?
24 A. Yes.

Page 66

1  Q. How are you familiar with this?
2  A. It's part of the rules and
3  regulations.
4  Q. When was the last time that you
5  looked at those regulations?
6  A. That I'm not sure. But if there
7  has ever been a revision or anything, I'm pretty
8  sure I would know. I looked at it, at least,
9  when I came into the Drug Control Unit.
10 Q. Four years ago?
11 A. That's correct.
12 Q. Are these posted anywhere in the
13 Drug Unit, these regulations?
14 A. No, I don't believe that they are.
15 Q. Are you familiar with this language
16 that police officers are prohibited from
17 conducting a strip-search outside of the confines
18 of the district station, unless that search is
19 authorized by a warrant.
20 A. If that is what it says there, yes.
21 Q. You're concluding that when they
22 say such search is authorized by a warrant, you
23 don't need a specific warrant to do a
24 strip-search authorizing a strip search as

Page 67

1  opposed to another type of search; isn't that
2  correct?
3  A. That's correct.
4  Q. You will admit that language is
5  somewhat ambiguous; do you not?
6  MR. COX: Objection.
7  A. Honestly, I haven't thought about
8  it.
9  Q. Because the language, "unless such
10 search," to wit, the strip-search, "is authorized
11 by a warrant," someone could interpret that to
12 mean you need a specific warrant authorizing a
13 strip-search as opposed to a general warrant
14 authorizing searches in general?
15 MR. COX: Objection.
16 A. Because it's authorized on the
17 warrant. It tells me I can search all persons
18 present. I would believe, yes, I can search that
19 individual.
20 Q. Including a strip-search?
21 A. Including a strip-search.
22 Q. But not a body-cavity search?
23 A. No.
24 Q. Why not a body-cavity search?

Page 68

1  A. If you're entering, you need a
2  warrant for a body-cavity search. That can only
3  be given by a Judge.
4  Q. But a warrant can only be given by
5  a Judge.
6  A. That's true. But a Judge has to
7  authorize it, and it has to be conducted by a
8  doctor.
9  Q. How is that language any different
10 in dealing with a cavity search?
11 A. There is another paragraph in the
12 rules and regulations. It states that you cannot
13 do a cavity search unless it is ruled by a Judge
14 and done by a medical physician or technician.
15    I believe that there is a specific
16 paragraph in regard to that.
17 Q. Under general consideration, the
18 purpose of this rule is to clarify department
19 policy relative to a custodial strip-search and
20 body-cavity search unauthorized without a
21 warrant.
22    MR. COX: If he is going to be
23    questioned about the rule, I would like
24    him to have a copy of it so we know the

Page 69

1  context is clear.
2     MR. HRONES: I think we can agree
3     on what it says.
4  Q. (By Mr. Hrones) Let me rephrase
5  that question. Let me show under Section 1 that
6  language. And I will show you the rule. "It may
7  be necessary for officers to conduct a
8  strip-search."
9     This rule provides strict
10 guidelines for conducting a strip-search. Do you
11 see that?
12 A. Yes. It's right here.
13 Q. So clearly, the rule is
14 distinguishing between an ordinary search, so to
15 speak, into the pockets and a strip-search?
16 A. That's correct. And here, where
17 it's referenced to earlier, it has to be
18 qualified medical personnel.
19 Q. Even to do an in-pocket search,
20 there has to be probable cause?
21 A. That's correct.
22 Q. And you're saying that you need
23 probable cause to do a strip-search, but in the
24 regulations it states the rule providing strict

MARCUS EDDINGS
October 26, 2004

Page 70

1  guidelines for conducting a strip-search?
2     A.  That's correct, yes.
3     Q.  The intent here is to have a higher
4  standard for strip-searches, than for ordinary
5  searches into the pocket?
6         MR. COX:  Objection.
7     Q.  Is that not true?
8     A.  I think that you would need to
9  articulate why you wanted to do a strip-search.
10 I think the probable cause of a search is the
11 probable cause of a search.
12        If you feel that the person is
13 secreting some type of contraband or weapons in
14 their clothes, you have to articulate why that is
15 the case.
16    Q.  My question is:  There clearly is a
17 higher standard for conducting a strip-search
18 than an ordinary search?
19    A.  It says, "If an in-pocket search is
20 inconclusive or impractical for searching for
21 contraband or weapons, it may be necessary for
22 the officer to conduct a strip-search."
23    Q.  Where are you reading that from?
24    A.  Right here, sir.

Page 71

1     Q.  They are talking about an arrestee.
2  It says, "When the officer has a probable cause,
3  then an arrestee --"
4     A.  Okay.
5     Q.  They are talking about an arrestee
6  in this case, and in this case he wasn't
7  arrested, was he?
8     A.  No, he was not.
9     Q.  Now, on the strip-search, you
10 believe that in a strip-search, the regulations
11 allow you to ask the person to spread their
12 cheeks of their rear end?
13    A.  Yes.
14    Q.  But the definition of strip-search
15 is the removal of, or rearrangement of, the
16 arrested person's clothing, so as to permit an
17 observation of the genitalia or the anus.  This
18 doesn't allow any touching of bodily parts.
19    A.  I didn't touch him.  But you can
20 order an individual to touch themselves.  I can
21 ask for him to touch himself.
22    Q.  What if he didn't agree?
23    A.  I would try to do a visual
24 inspection without him doing it.

Page 72

1     Q.  But you believe that you have
2  authority under this rule to ask him to do some
3  touching of his own bodily parts?
4     A.  That's correct.
5     Q.  So do you have any explanation as
6  to why this is a special rule for strip-searches,
7  and yet the simple language in the warrant, to
8  search all people in the apartment, allows you to
9  both do an in-pocket search and a strip-search?
10        MR. COX:  Objection.
11    Q.  Let me rephrase that.  According to
12 you, the language in the warrant is to the effect
13 that you may search all persons present, meaning
14 you can do either an in-pocket search or a
15 strip-search?
16    A.  That's correct.
17    Q.  And you find nothing inconsistent
18 with your interpretation of that warrant
19 directive and the fact that they have a special
20 regulation for strip-searches?
21    A.  They are two different entities.
22 They are department rules and regulations, and
23 this is the warrant giving authorization to
24 search -- I'm not sure I understand your

Page 73

1  question.
2     Q.  You're still bound by the
3  regulations even though you have a warrant from
4  the Court, are you not?
5     A.  That's correct.
6     Q.  So the warrant, in general terms,
7  allows you a certain -- you're saying that even
8  though it doesn't say strip-search, just because
9  it allows a search, you can do either a
10 strip-search or an ordinary search?
11    A.  That's correct.
12    Q.  That's true even though you have
13 language in the rules on a strip-search, that
14 there will be strict guidelines in conducting a
15 strip-search?
16    A.  That's correct.  I followed it
17 within the guidelines.
18        MR. HRONES:  I have no further
19 questions.
20        MR. COX:  I have no questions.
21
22 (Deposition concluded at 3:58 p.m.)
23
24

MARCUS EDDINGS
October 26, 2004

Page 74

1  I, BARRY MICHAEL HARRIS, a Notary Public in
2  and for the Commonwealth of Massachusetts, do
3  hereby certify that MARCUS EDDINGS came before me
4  on the 26th day of October, 2004, at Boston,
5  Massachusetts, and was by me duly sworn to
6  testify to the truth and nothing but the truth as
7  to his knowledge touching and concerning the
8  matters in controversy in this cause; that he was
9  thereupon examined upon his oath and said
10 examination reduced to writing by me; and that
11 the statement is a true record of the testimony
12 given by the witness, to the best of my knowledge
13 and ability.
14   I further certify that I am not a relative or
15 employee of counsel/attorney for any of the
16 parties, nor a relative or employee of such
17 parties, nor am I financially interested in the
18 outcome of this action.
19      WITNESS MY HAND this 17th day of
20 December, 2004.
21
22
23 Barry Michael Harris    My Commission Expires:
24 Notary Public           August 7, 2009

Page 75

1  Today's date:    December 17, 2004
2  To:              Stephen G. Cox, Esq.
3  Copied To:       Stephen Hrones, Esq.
4  From:            Barry Michael Harris
5  Deposition of:   Marcus Eddings
6  Taken:           October 26, 2004
7  Action:          SANTIAGO VS. WILLIAM J. FEENEY,
8                   et al.
9
10   Enclosed is a copy of the deposition of Marcus
11 Eddings. Pursuant to the Rules of Civil
12 Procedure, Mr. Eddings has 45 days to sign the
13 deposition from today's date.
14   Please have Mr. Eddings sign the enclosed
15 signature page. If there are any errors, please
16 have him mark the page, line and error on the
17 enclosed correction sheet. He should not mark
18 the transcript itself. This addendum should be
19 forwarded to all interested parties.
20   Thank you for your cooperation in this matter.
21
22
23
24

Page 76

1       UNITED STATES DISTRICT COURT
2       DISTRICT OF MASSACHUSETTS
3          Civil Action No.:04CV10746JLT
4
5  **********************************
6  IVAN SANTIAGO,              *
7       Plaintiff              *
8  vs.                         *
9  WILLIAM J. FEENEY, MARCUS   *
10 EDDINGS, and the CITY OF BOSTON, *
11      Defendants             *
12 **********************************
13
14      I, MARCUS EDDINGS, do hereby certify,
15 under the pains and penalties of perjury, that
16 the foregoing testimony is true and accurate,
17 to the best of my knowledge and belief.
18      WITNESS MY HAND this   day of
19 , 2004
20
21
22
23 _____
         MARCUS EDDINGS
24 BMH