WILLIAM F. FEENEY
January 10, 2005

Page 1

1               UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3                 C.A. NO. 04CV10746JLT

4

5    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

6    IVAN SANTIAGO,                        *

7               Plaintiff                  *

8    vs.                                   *

9    WILLIAM J. FEENEY, MARCUS             *

10   EDDINGS, AND THE CITY OF BOSTON,      *

11              Defendants                 *

12   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

13

14          DEPOSITION OF WILLIAM F. FEENEY

15               HRONES & GARRITY

16          Lewis Wharf Bay, Suite 232

17            Boston, Massachusetts

18          January 10, 2005      10:05 a.m.

19

20

21

22             Maryellen Coughlin

23      Registered Professional Reporter

24

WILLIAM F. FEENEY
January 10, 2005

**Page 2**

```
 1   APPEARANCES:
 2
 3   Representing the Plaintiff:
 4       HRONES & GARRITY
 5       Lewis Wharf Bay, Suite 232
 6       Boston, Massachusetts 02110
 7       BY: Stephen Hrones, Esq.
 8       (617) 227-4019
 9
10   Representing the Defendants:
11       City of Boston
12       Law Department
13       City Hall, Room 615
14       Boston, Massachusetts 02201
15       BY: Stephen G. Cox, Esq.
16       (617) 635-4064  (617) 635-3199
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1               INDEX
 2
 3   WITNESS:    WILLIAM F. FEENEY
 4
 5   EXAMINATION:              Page
 6   MR. HRONES                  4
 7
 8
 9
10
11   EXHIBITS FOR IDENTIFICATION:
12   No.        Description      Page
13       None
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1           PROCEEDINGs
 2
 3       MR. HRONES: The usual
 4   stipulations?
 5       MR. COX: Yes.
 6       MR. HRONES: All objections saved
 7   until the time of trial except motions to strike.
 8       MR. COX: And form.
 9       MR. HRONES: And form. Does he
10   want to read and sign?
11       MR. COX: Yes.
12       MR. HRONES: Waive the notary?
13       MR. COX: Correct. Can we have 45
14   days?
15       MR. HRONES: Fine.
16
17       WILLIAM F. FEENEY,
18   having been first duly sworn, was examined
19   and testified as follows:
20
21           EXAMINATION
22   BY MR. HRONES:
23       Q.   What is your name, please?
24       A.   William J. Feeney.
```

**Page 5**

```
 1       Q.   Where do you live?
 2       A.   Excuse me.
 3       Q.   Where do you live?
 4       MR. COX: Well, home address is --
 5       Q.   No, the town or -- do you live in
 6   the City of Boston?
 7       A.   No, I don't.
 8       MR. COX: Business address.
 9       Q.   Okay. What's your profession?
10       A.   I'm a police officer and a sergeant
11   detective.
12       Q.   And how long have you been a police
13   officer?
14       A.   A little over 16 years.
15       Q.   And when were you born?
16       A.   3/26/1958.
17       Q.   And where were you born?
18       A.   In Boston.
19       Q.   Where did you go to high school?
20       A.   Charlestown High.
21       Q.   You graduated?
22       A.   I did.
23       Q.   And what did you do upon
24   graduation?
```

2 (Pages 2 to 5)

WILLIAM F. FEENEY
January 10, 2005

Page 6

| | | |
|---|---|---|
| 1 | A. | I went into the electrical field as |
| 2 | an electrician apprentice. | |
| 3 | Q. | Right out of high school? |
| 4 | A. | Yes. |
| 5 | Q. | And how long were you in that |
| 6 | field? | |
| 7 | A. | A short time. I don't recall. |
| 8 | Q. | And then what did you do? |
| 9 | A. | I was an auto mechanic for a while. |
| 10 | Q. | How long was that? |
| 11 | A. | About six or eight years. |
| 12 | Q. | And then what did you do? |
| 13 | A. | I was unemployed for a short period |
| 14 | of time. | |
| 15 | Q. | Like a year? |
| 16 | A. | I don't recall how long. I went to |
| 17 | work for the medical examiner's office for six | |
| 18 | years and then became a police officer in 1988. | |
| 19 | Q. | Are you married? |
| 20 | A. | I am. |
| 21 | Q. | Children? |
| 22 | A. | Two. |
| 23 | Q. | And what is your position now with |
| 24 | the police department? | |

Page 7

| | | |
|---|---|---|
| 1 | A. | I'm a sergeant detective. |
| 2 | Q. | In what area? |
| 3 | A. | Area E-13. I'm assigned to the |
| 4 | drug unit in Area E-13, in Jamaica Plain. | |
| 5 | Q. | How long have you been assigned to |
| 6 | that unit? | |
| 7 | A. | I've been with the drug unit since |
| 8 | 2000. I've been assigned over to Area E-13 since | |
| 9 | May of 2004. | |
| 10 | Q. | And where were you before that? |
| 11 | A. | Area B-2, in Roxbury. |
| 12 | Q. | How long were you there? |
| 13 | A. | About two and a half years. |
| 14 | Q. | And before that? |
| 15 | A. | I was a uniform sergeant in Area |
| 16 | B-2 for two years. | |
| 17 | Q. | Not in the drug squad? |
| 18 | A. | Not in the drug squad, no. |
| 19 | Q. | Have you ever been sued before? |
| 20 | A. | Yes, I have. |
| 21 | Q. | When was that? |
| 22 | A. | I don't recall. |
| 23 | Q. | Before this case? You were sued |
| 24 | before? | |

Page 8

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | How many times? |
| 3 | A. | Maybe once or twice. At least |
| 4 | twice. | |
| 5 | Q. | In federal court? |
| 6 | A. | One case went to federal court, |
| 7 | yes. | |
| 8 | Q. | Did it go to trial? |
| 9 | A. | No, it didn't. |
| 10 | Q. | Did it settle out? |
| 11 | A. | I never was apprised of what the |
| 12 | result was. | |
| 13 | Q. | What was that case about? |
| 14 | A. | It was the result of an alleged |
| 15 | assault and battery while making an arrest. | |
| 16 | Q. | And who was the complainant in that |
| 17 | case? | |
| 18 | A. | It's been so long I can't remember |
| 19 | the name. | |
| 20 | Q. | You're talking what, ten years ago |
| 21 | or -- | |
| 22 | A. | At least ten years ago, yeah. |
| 23 | Q. | Who was the lawyer for the |
| 24 | complainant? | |

Page 9

| | | |
|---|---|---|
| 1 | A. | Again, I don't recall. I couldn't |
| 2 | even tell you who the city attorney was. | |
| 3 | Q. | And there was another case, too, |
| 4 | other than that? | |
| 5 | A. | Yes. |
| 6 | Q. | And what case was that? |
| 7 | A. | It was as a result of a motor |
| 8 | vehicle accident. | |
| 9 | Q. | Someone was injured and they sued |
| 10 | the department? | |
| 11 | A. | They were alleging they were |
| 12 | injured, yes. | |
| 13 | Q. | You were in a cruiser and you were |
| 14 | in an accident? | |
| 15 | A. | That's correct. |
| 16 | Q. | And is that over now, too? |
| 17 | A. | Yes, it is. |
| 18 | Q. | Was that settled, too? |
| 19 | A. | Again, I wasn't apprised of what |
| 20 | the disposition was. | |
| 21 | Q. | But it didn't go to trial? |
| 22 | A. | No, it didn't. |
| 23 | Q. | Have you been complained against by |
| 24 | citizens? | |

3 (Pages 6 to 9)

WILLIAM F. FEENEY
January 10, 2005

Page 10

1    A.    Yes, I have.
2    Q.    How many times?
3    A.    I don't recall.
4    Q.    The federal court case, the alleged
5  excessive use of force, was that a case that also
6  resulted in an internal affairs investigation?
7    A.    No, there was never an internal
8  affairs complaint made on that.
9    Q.    Have you ever had any complaint
10  sustained against you?
11    A.    One.
12    Q.    This one or another one?
13    A.    This one.
14    Q.    This is the first one that's ever
15  been sustained?
16    A.    That's correct.
17    Q.    And what do you understand the
18  basis for the sustaining of that?  What is the
19  allegation that you did wrong?
20    A.    The part of the complaint that was
21  sustained was that as a result of a strip search
22  that was made and it wasn't entered into the
23  police report.  It was a violation of rules and
24  regulations.

Page 11

1    Q.    It's suppose to be in the police
2  report if you do a strip search?
3    A.    That's correct.
4    Q.    What says that?  The regulation
5  says that?
6    A.    The rule and regulation, yes.
7    Q.    Relative to strip search?  It's
8  within that rule and regulation?
9    A.    That's correct.
10    Q.    And why wasn't it in the police
11  report in this case?
12    A.    The officer that wrote the report
13  apparently forgot to put it in.
14    Q.    So why did they blame you if the
15  officer didn't put it in that wrote the report?
16    A.    I was the supervisor that was
17  supervising that officer that particular day.
18    Q.    And so you review the report?
19    A.    No, I didn't review the report, no.
20    Q.    You didn't sign off on it?
21    A.    No, I did not.
22    Q.    So you didn't review the report and
23  they still held you responsible?
24    A.    That's correct.

Page 12

1    Q.    So what are they saying you should
2  have done, read the report?
3    A.    They said it was my responsibility
4  to ensure that the incident was documented in the
5  report.
6    Q.    And is that on appeal, are you
7  appealing the --
8    A.    I'm appealing the decision, yes.
9    Q.    And where does that stand now?
10    A.    It's in the process of being
11  appealed.
12    Q.    And that takes quite a while,
13  though, right?
14    A.    It does.
15    Q.    What was the penalty assessed
16  against you?
17    A.    A two-day suspension.
18    Q.    Did you do the two days?
19    A.    Yes, I did.
20    Q.    Now, prior to this strip search,
21  had your unit not indicated when there was strip
22  searches in police reports?
23    A.    I don't know.
24    Q.    I'll rephrase that.  Was it a

Page 13

1  practice not to put that there was a strip search
2  in police reports before this incident?
3    A.    I don't quite understand that
4  question.
5    Q.    Okay.  Were you aware of the
6  regulation before this incident that required you
7  to indicate in the police report if there were a
8  strip search?
9    A.    It was never directly brought to my
10  attention, and if I had read it, I may have
11  forgot about it.
12    Q.    So in strip searches prior to this
13  incident, were they indicated in police reports?
14    A.    I don't know if it was specifically
15  dictated that strip searches were done.
16    Q.    What I'm getting at is, was this
17  just an isolated incident where it wasn't put in
18  the police report or was it a situation where
19  strip searches were not noted in the police
20  reports for one reason or another, either because
21  people didn't know about the regulation or
22  whatever?
23    A.    I think perhaps maybe that in a lot
24  of cases strip searches weren't put in police

4 (Pages 10 to 13)

WILLIAM F. FEENEY
January 10, 2005

Page 14

1  reports because they were not aware of that one
2  paragraph down at the bottom of the rule and
3  regulation.
4      Q.      Are they now being put in all
5  police reports, as far as you know?
6      A.      As far as I know, yes.  With
7  respect to my squad.  I can't say what the rest
8  of the drug unit is doing.
9      Q.      And you head up a squad?
10     A.      I do.
11     Q.      Of how many men?
12     A.      One detective and four officers.
13     Q.      And did you inform them all very
14 clearly that they had to put it in the police
15 report?
16     A.      After this incident, I informed my
17 old squad, and when I took over as the new boss
18 in District 13, I informed them also.
19     Q.      And who's your boss now?
20     A.      The Lieutenant detective in charge
21 of the drug unit, Stephen Meade.
22     Q.      Were you involved in a search on
23 Cheney Street on March 20th of 2003?
24     A.      Yes, I was.

Page 15

1      Q.      In what capacity?
2      A.      I was the supervisor in charge.
3      Q.      Did you head a drug unit at that
4  point?
5      A.      I was in charge of one of the two
6  squads at Area B-2 at that time, yes.
7      Q.      And were both squads involved in
8  that?
9      A.      Members of both squads were
10 involved, yes.
11     Q.      But you were in charge?
12     A.      That's correct.
13     Q.      And why is that, as opposed to the
14 person that was the head of the other squad?
15     A.      He was unavailable at the time.
16     Q.      What was his name?
17     A.      Sergeant Detective Linskey.
18     Q.      So he wasn't in on that search?
19     A.      No, he wasn't.
20     Q.      Even though he was listed as being
21 in on the search?
22     A.      I don't know if he was listed as
23 being on the search.  I know that his name did
24 appear on one piece of paper, which is common

Page 16

1  because we prepare certain documents with
2  everybody's name on them when we're doing joint
3  investigations or joint search warrants, and it
4  appears that his name wasn't taken off it.
5      Q.      And what document was his name on?
6      A.      It's what we call a white sheet
7  which documents all the individuals present as
8  well as any drugs that are seized and any
9  defendants that are arrested.
10     Q.      His name was on that white sheet?
11     A.      I believe so, yes.
12     Q.      Now, were you involved in the
13 investigation leading up to the search?
14     A.      No, I wasn't.
15     Q.      Who conducted that?
16     A.      The applicant on the search warrant
17 was Officer Paul Quinn.
18     Q.      And he was within your unit or the
19 other unit?
20     A.      He was in the other squad of B-2.
21     Q.      So the other squad did most of the
22 preparatory work?
23     A.      That's correct.
24     Q.      But you were present when the entry

Page 17

1  was made?
2      A.      That's correct.
3      Q.      And where did you enter the
4  apartment?
5      A.      We all entered in through the same
6  door, the front door of the apartment.
7      Q.      Everyone came in the front?
8      A.      That's correct.
9      Q.      Didn't someone go around to the
10 back?
11     A.      We, as a group, made an entry.  We
12 came in through the back of the building, and we
13 entered in through the rear common hallway door
14 in the back of the building which then brought us
15 up to the front door of the apartment.
16     Q.      Was it a surprise entry?
17     A.      No, they saw us coming.  We were
18 making our way into the common hallway.
19     Q.      Did you hear anyone yell out?
20     A.      I heard some yelling coming.  I
21 couldn't distinguish what it was, but somebody
22 further up the line stated that they're
23 yelling were coming, the police are coming, 50 is
24 coming.

5 (Pages 14 to 17)

WILLIAM F. FEENEY
January 10, 2005

Page 18

1  Q.    What does 50 mean?
2  A.    50 is street slang for police.
3  Q.    By people on the street?
4  A.    That's correct.
5  Q.    Do you know the origins of that,
6  why they say 50?
7  A.    Some people I've talked to said it
8  goes back to the old days of the TV show Hawaii
9  50.
10  Q.    What did you do when you went in
11  the apartment?
12  A.    As I went into the apartment, other
13  officers were in there ahead of me. They started
14  sweeping the apartment for individuals in the
15  apartment. I observed one individual seated on
16  the couch in the living room. There was another
17  one that was just starting to exit from a
18  doorway, which appeared to be a bedroom right off
19  the living room, and then there was a female
20  which was -- I believe she was either in the
21  kitchen or right near the kitchen, the hallway,
22  and where there was a small juvenile child that
23  was also in the apartment.
24  Q.    Who was the subject of the search

Page 19

1  warrant?
2  A.    Rolando Lugo.
3  Q.    Was he in there?
4  A.    Yes, he was.
5  Q.    Did the officers know who he was
6  when they entered?
7  A.    Officer Quinn knew who he was, yes.
8  Q.    Had he made a buy from him himself.
9  A.    I'm not familiar with the
10  circumstances surrounding the investigation.
11  Q.    So what did you do?
12  A.    As we do in all search warrants we
13  had everybody brought into the living room till
14  we made sure everybody was secured.
15  Q.    I'm not interested in all search
16  warrants. I'm saying in this case.
17  A.    Everybody was brought into the
18  living room.
19  Q.    By you?
20  A.    No, by anybody that found an
21  individual in the apartment.
22  Q.    But what did you do specifically?
23  A.    I just stood there at the time
24  because I had nothing to do, except supervise.

Page 20

1  Q.    And did you have any conversation
2  with the woman?
3  A.    No.
4  Q.    Was she searched?
5  A.    She was searched, yes.
6  Q.    By whom?
7  A.    A female officer.
8  Q.    And what type of search?
9  A.    When the female officer came to the
10  apartment, I just asked that she search her. She
11  took her into another room and searched her.
12  Q.    Was it a strip search?
13  A.    I wasn't in there. I don't know.
14  Q.    Well, didn't you ask her whether it
15  was?
16  A.    I asked her to search her. She
17  came back and told me she didn't have anything on
18  her. I didn't ask whether she stripped searched her
19  or whether she just patted her down.
20  Q.    But if she had stripped searched
21  her, you would have had to put that in the
22  report?
23  A.    That's correct.
24  Q.    So now you ask the nature of the

Page 21

1  search, don't you, when you have a matron search
2  a female? Don't you inquire as to the nature of
3  the search?
4  A.    No.
5  Q.    Because you would have to put that
6  in your report as the supervisor.
7  A.    Well, if I told her to strip search
8  her, then I'd know it was a strip search. I just
9  asked her to search her, that's all I asked her
10  to do.
11  Q.    And so you assumed she didn't strip
12  search?
13  A.    I assumed she didn't, no.
14  Q.    Because if you want a strip search
15  you specifically indicate that?
16  A.    I would have indicated it to her,
17  yes.
18  Q.    What about Lugo, was he searched?
19  A.    Yes, he was.
20  Q.    Initially what type of search was
21  done of him?
22  A.    Initially he had retrieved drugs
23  from the back of his pants area, from between his
24  buttocks.

6 (Pages 18 to 21)

WILLIAM F. FEENEY
January 10, 2005

Page 22

1   Q.   Was that before any search was done
2   of him?
3   A.   Yes, correct.
4   Q.   Had he been frisked before that?
5   A.   Yes, he had been.
6   Q.   For weapons?
7   A.   Yes, he had been.
8   Q.   And then before there was any
9   further search, he pulled something out?
10   A.   While Officer Quinn and Broderick
11   were having a conversation with him, he
12   volunteered that he had drugs on him, and we
13   asked where they were, and he indicated that they
14   were down his pants. I can't remember ex -- I
15   think his exact phrase was in my ass, or
16   something like that, but then he was
17   unhandcuffed, and he loosened his pants up a bit,
18   and he reached down the back of his pants with
19   one hand and retrieved a plastic bag.
20   Q.   Do you know where he retrieved it
21   from?
22   A.   From inside his pants.
23   Q.   Now, is that general procedure, to
24   allow the individual to pull the drugs out,

Page 23

1   rather than the officer doing the search, doing
2   it?
3   A.   Well, he had already been searched
4   for weapons, so we were going to allow him to
5   grab the drugs.
6   Q.   And where did he say he was getting
7   them from?
8   A.   He said he had them down the back
9   of his pants.
10   Q.   Did he mention his rear end?
11   A.   I think I just said he said he had
12   them in his -- I can't remember his exact words,
13   but I think there was something like I got them
14   in my ass, or something like that.
15   Q.   Now, was any further search made of
16   him?
17   A.   He was further searched back at
18   Area B-2, I believe.
19   Q.   But at the apartment?
20   A.   No.
21   Q.   He wasn't strip searched?
22   A.   Lugo at the scene, no, I don't
23   believe so.
24   Q.   Why wasn't he strip searched?

Page 24

1   A.   Because he was under arrest. He
2   was being taken back to the district.
3   Q.   So if they're under arrest, you
4   don't strip search them?
5   A.   Most commonly they're searched back
6   at the district.
7   Q.   Was he strip searched back at the
8   district?
9   A.   I wasn't there. I don't know.
10   Q.   So is that your policy, then, if
11   you arrest someone you don't strip search them at
12   the scene?
13   A.   First of all, it depends on what
14   they're arrested for. Second of all, if
15   they're being arrested, just to expedite matters
16   we'll get them down to the station and get them
17   searched down at the station once we're sure that
18   they have no weapons on them.
19   Q.   How do you know they're not going
20   to throw something away after they've been
21   arrested on the way to the station?
22   A.   Well, they're handcuffed when
23   they're brought to the station. The cruisers are
24   checked. The vehicle that's being used to

Page 25

1   transport them is checked to make sure there's no
2   drugs in it, no contraband. Then once they're
3   taken out at the station, then again they check
4   the vehicle to make sure that nothing has been
5   dropped in the vehicle.
6   Q.   Now, was there a third individual
7   in the apartment?
8   A.   Yes, Ivan Santiago.
9   Q.   And you saw him?
10   A.   I did.
11   Q.   And was he handcuffed when you came
12   in?
13   A.   Yes, he was. He was in the process
14   of being handcuffed.
15   Q.   And is everyone in the apartment
16   that's being searched handcuffed?
17   A.   Initially, until we got everybody
18   secured and straightened out, who is who,
19   everybody is handcuffed.
20   Q.   Did you have any conversation with
21   him?
22   A.   No.
23   Q.   Was there any indication in the
24   affidavit to the warrant that he was involved in

7 (Pages 22 to 25)

WILLIAM F. FEENEY
January 10, 2005

Page 26

1  the drug dealing?
2      A.    I never read the affidavit. All I
3  read was the warrant that morning before we went
4  out to execute the search. The warrant had
5  already been obtained. The affidavit had already
6  been approved by another supervisor, and I didn't
7  read it.
8      Q.    What about the warrant, did that
9  indicate that the main subject was Lugo?
10     A.    To the best of my recollection, the
11 warrant indicated that the main target was
12 Rolando Lugo.
13     Q.    And before you went in, you knew
14 the target was Lugo, did you not?
15     A.    I knew one of the targets was Lugo,
16 yes.
17     Q.    Who were the other targets?
18     A.    Well, it's always up for grabs when
19 you go into a crack house or someplace where
20 drugs are being sold as to who's actually
21 involved in the distribution or the sales.
22     Q.    Yeah, but no one else specifically
23 was mentioned?
24     A.    No one else specifically was

Page 27

1  mentioned in the warrant.
2      Q.    Now, was Santiago frisked?
3      A.    After he was handcuffed, he was
4  frisked, yes.
5      Q.    So is that normal procedure, to
6  frisk everybody in the apartment, you know,
7  regardless of whether there's any indication that
8  they're involved?
9      A.    That's correct.
10     Q.    Now, was he searched beyond the
11 frisk? In other words, a frisk is just a pat
12 down, is it not?
13     A.    That's correct.
14     Q.    The next stage in the search would
15 be going into pockets, would it not?
16     A.    That's correct.
17     Q.    Now, was he searched beyond the
18 frisk before being taken into that room?
19     A.    Being taken into what room?
20     Q.    The bathroom.
21     A.    I don't know if he was searched
22 prior to being taken into the bathroom.
23     Q.    Do you have authority to search a
24 person who happens to be in a place where you

Page 28

1  have authority to conduct a search? Let me
2  strike that.
3          Do you believe you have authority
4  to go beyond a frisk of any individual in an
5  apartment that's being searched, regardless of
6  whether there's probable cause as to that
7  particular individual?
8      A.    Certainly if we have, it indicated
9  on a search warrant, when we're executing a
10 search warrant, that we can search any and all
11 persons present, then we will search any and all
12 persons present, because the interpretation is
13 that probable cause exists to get the search
14 warrant for the apartment and that transfers over
15 to probable cause to search anybody for drugs.
16 It's included in the scope of the search as far
17 as we're concerned because you have, any and all
18 persons present, you can search them and any
19 drugs can be hidden.
20     Q.    You've been taught that you can
21 search anybody in an apartment beyond a frisk
22 even though you have no specific information that
23 that person is involved in drug dealing?
24     A.    Past practice has been that when

Page 29

1  you have a search warrant that indicates any and
2  all persons present can be searched, then we
3  search any and all persons present.
4      Q.    And is that still the policy today?
5      A.    To the best of my recollection, it
6  might be. I haven't seen any orders or rules and
7  regulations stating differently, that I can
8  recall.
9      Q.    What if there are children in the
10 apartment?
11     A.    Most of the time children aren't
12 searched, unless we have some kind of specific
13 information that they're putting drugs in their
14 diaper or they're holding the drugs.
15     Q.    Why aren't the children searched?
16     A.    Because most times people don't put
17 drugs on the children, but sometimes they do.
18     Q.    Are you familiar with the supreme
19 court case, the Yebba case, relative to, you
20 know, whether or not a search can be conducted of
21 everyone in an apartment when you have a search
22 warrant to go in there?
23     A.    I don't think I am.
24     Q.    So it's your position that if the

8 (Pages 26 to 29)

WILLIAM F. FEENEY
January 10, 2005

Page 30

1   warrant says we can search everyone in the
2   apartment that gives you authority to search
3   anybody in the apartment without having any
4   specific knowledge of involvement by that person?
5        A.   That's what the past practice has
6   been, yes.
7        Q.   And it's the present practice
8   today, too?
9        A.   Unless -- I mean -- again, I can't
10  remember reading a --
11       Q.   Okay. Let's say you go into an
12  apartment, and you're after a, you know, one
13  person who is an alleged drug dealer, and you see
14  another adult you know nothing about, just
15  sitting in the apartment, it's your position that
16  you have the authority to search that person to
17  the extent that you go in their pockets?
18       A.   If the warrant indicates that we
19  can search any and all persons present, yes.
20       Q.   And you don't need further probable
21  cause? Once that warrant says you can search
22  everyone, you don't have to have any additional
23  probable cause?
24       A.   Well, based on the affidavit that

Page 31

1   accompanies the application for the search
2   warrant, having a neutral and detached party, be
3   it either a clerk magistrate or a judge, reading
4   that application and reading the accompanying
5   affidavit, if they choose to decide that there's
6   probable cause to search any and all persons
7   present that are in the apartment when we execute
8   the warrant, then we feel that they've authorized
9   us to search them.
10       Q.   And that's almost invariably the
11  case when you get a warrant for the search of an
12  apartment, that the magistrate gives you
13  authority to search any and all persons there, is
14  that the case?
15       A.   No, some don't.
16       Q.   But most of them do, don't they?
17       A.   I would say maybe a good percentage
18  of them do.
19       Q.   Well, do you ask for that authority
20  or the magistrate just checks that off if he
21  wants?
22       A.   Sometimes the officers will request
23  it. Sometimes he'll ask the officer if they want
24  to search any and all persons present.

Page 32

1        Q.   Now, what about a strip search, do
2   you believe that warrant gives you authority to
3   strip search anyone who's in the apartment,
4   regardless of whether you have any basis to
5   believe they're involved in the drug dealing?
6        A.   Well, again, it depends on the
7   circumstances there. I mean, in this particular
8   case, Mr. Lugo had drugs secreted down the back
9   of his pants, in between the cheek of his
10  buttocks. It wouldn't be uncommon for somebody
11  else that was involved in it to have drugs
12  secreted in the same place.
13       Q.   But my question was, without any
14  other factors coming into play as to the specific
15  evidence, do you believe that that search warrant
16  that says search any and all people authorizes a
17  strip search, apart from any other factors?
18       A.   It's taken on a case-by-case
19  individual basis.
20       Q.   But it says, does it not, search
21  any and all persons, so you're saying that
22  doesn't give you authority to strip search
23  everyone in the apartment without having more, or
24  do you think that gives you authority to strip

Page 33

1   search everybody?
2        A.   Well, it's kind of a two-part
3   question.
4        Q.   Okay, let me make it clear. Is it
5   your position that a warrant that says you can
6   search any and all persons found in the apartment
7   gives you authority, if you want, to strip search
8   anyone in that apartment?
9        A.   No.
10       Q.   So you believe as to strip search,
11  as opposed to an ordinary search, putting your
12  hands in a pocket, you need something more than
13  the warrant authorizing a search of everybody?
14       A.   Again, it's on a case-by-case
15  basis, depending upon how the officers feel after
16  talking to the individual that they're searching,
17  as to whether we strip search them or not.
18       Q.   But my question was once again, is
19  it your position that a search warrant that
20  allows you to search any and all persons allows
21  you to strip search anyone there if you want,
22  without any other factors?
23       A.   No.
24       Q.   It doesn't?

9 (Pages 30 to 33)

WILLIAM F. FEENEY
January 10, 2005

Page 34

1    A.    No.
2    Q.    So you need something else in order
3    to do a strip search?
4    A.    That's correct.
5    Q.    And why do you say that?
6    A.    Again --
7    Q.    Why do you say you need something
8    more?
9    A.    Well, a strip search is certainly
10   more of an intrusive action towards somebody.
11   And, again, if we have a search warrant that says
12   any and all persons present, we usually search
13   any and all persons present. We also have a
14   conversation with the individuals. If the
15   officer feels that they may be concealing
16   something else on them that they can't detect
17   through going through their pockets, then a strip
18   search will be done.
19   Q.    Did you authorize a strip search in
20   this case?
21   A.    I told Officer Eddings to take
22   Mr. Santiago into the bathroom and search him.
23   Q.    Did you intend that he do a strip
24   search?

Page 35

1    A.    I thought he was going to, yes.
2    Q.    And what was the basis for your
3    ordering him to do a strip search?
4    A.    Again, we found drugs in the
5    apartment. We found drugs on the person,
6    Mr. Lugo, concealed in an area that wouldn't be
7    detected normally by doing a regular search.
8    Q.    Did you have any evidence, other
9    than what you just mentioned, to suggest Santiago
10   was involved in drug dealing?
11   A.    I didn't know at that time. I
12   hadn't read the affidavit, as I said. The only
13   one that was specifically named in the warrant
14   was Mr. Lugo.
15   Q.    And you've read it since, haven't
16   you?
17   A.    The affidavit or the application?
18   Q.    Yes.
19   A.    No, I haven't read the application,
20   no.
21   Q.    But the affidavit you've read?
22   A.    The affidavit, no, I haven't.
23   Q.    So you authorized a strip search
24   solely on the basis that Lugo had said I have

Page 36

1    stuff in my ass and took it out, is that right?
2    A.    I felt that Santiago could have
3    drugs secreted somewhere on his body that
4    wouldn't be detected by a normal search.
5    Q.    But you certainly didn't have
6    probable cause to believe he had drugs secreted
7    in a way that only a strip search would reveal
8    them, did you?
9    A.    Well, we had probable cause to
10   search any and all persons present on the
11   premises when we entered.
12   Q.    I'm saying this specific
13   individual. You had probable cause to enter the
14   apartment, right --
15   A.    That's right.
16   Q.    -- to search for drugs. My
17   question is, you didn't have specific probable
18   cause to believe that Santiago had drugs secreted
19   in such a way that you had to do a strip search,
20   did you?
21   A.    We didn't have any firsthand
22   knowledge of it, no.
23   Q.    But you had a suspicion that he
24   might because the other guy had it?

Page 37

1    A.    I felt there was a good probability
2    he did, yes.
3    Q.    Why did you figure there was a good
4    probability that Santiago had it up his rear end
5    if Lugo did?
6    A.    A lot of times, and not every time,
7    but a lot of times when we go into these
8    locations there's more than one person that's in
9    the apartment that's involved in the
10   distribution, involved in the sale of drugs from
11   those locations or they have other people holding
12   the drugs for them.
13   Q.    Well, do you believe that a strip
14   search is an extreme invasion of a person's
15   privacy?
16   A.    It is to a certain extent an
17   invasion of privacy, yes.
18   Q.    Now, were you present when the
19   search was going on in the bathroom?
20   A.    I was present in the apartment.
21   Q.    Were you standing outside the door?
22   A.    No, I wasn't.
23   Q.    Was there another officer standing
24   outside the door?

10 (Pages 34 to 37)

WILLIAM F. FEENEY
January 10, 2005

| | Page 38 |
|---|---|

1    A.    I believe there was, yes.
2    Q.    And was the door open or closed, if
3  you know?
4    A.    I'm not sure. I think it may have
5  been shut, but I can't be certain.
6    Q.    Was it suppose to be shut or not?
7    A.    It depends on the officer's
8  preference. Some will leave it open just a
9  little bit in case anything happens inside the
10  bathroom, other officers can assist them, others,
11  you know, prefer to close it.
12    Q.    Have you done strip searches
13  yourself?
14    A.    Yes, I have.
15    Q.    Outside of the police station?
16    A.    What do you mean outside of the
17  police station?
18    Q.    Well, have you done strip searches
19  in the police station when you're booking
20  somebody?
21    A.    Yes, I have.
22    Q.    Have you done some in apartments
23  where you're searching the apartment?
24    A.    Yes, I have.

| | Page 39 |
|---|---|

1    Q.    Has there been any change at all in
2  whether, on the issue of whether or not you do a
3  strip search since this suit, since the complaint
4  was made to the IAD about the search in this
5  case?
6    A.    Not that I recall seeing in a rule
7  and regulation.
8    Q.    So under the same circumstances --
9  no, I'm talking as a practical matter. Now,
10  under the same circumstances as in this case, you
11  would still strip search someone like Santiago,
12  under the facts of this case?
13    A.    Again, it all depends. On a
14  case-by-case basis.
15    Q.    But assume exactly the same facts
16  as this, you know, you go in, you have a search
17  warrant that indicates one person is selling the
18  drugs and that person takes some out from his
19  rear end. Under that factual scenario, if that
20  occurs today, would you still strip search a
21  third party like Santiago was in this case?
22    A.    If everything was the same as when
23  we entered into the apartment, all the facts were
24  the same, probably, yes.

| | Page 40 |
|---|---|

1    Q.    Now, you're familiar with the
2  policy, the strip search policy of the City of
3  Boston, are you not?
4    A.    I am.
5    Q.    Do you believe there is any
6  ambiguity in that regulation or do you find it
7  absolutely clear as to exactly what authority you
8  have to strip search outside of the police
9  station?
10    A.    I think it is pretty clear.
11    Q.    What about if you don't have a
12  warrant but you arrest someone in the street, but
13  you don't arrest them in the street, you just are
14  frisking them without making an arrest, do you
15  believe you can strip search under those
16  circumstances?
17    MR. COX: Objection.
18    A.    It depends on the circumstances
19  surrounding the stop. I mean, if you're stopping
20  somebody and you're frisking them prior to
21  conducting an interview or you have suspicion
22  that they may be armed with a weapon, that's one
23  thing. Certainly you wouldn't be strip searching
24  them. If you have the probably cause to believe,

| | Page 41 |
|---|---|

1  based on the investigation that you're doing,
2  that this individual has drugs on him and has
3  been known to in the past or has secreted drugs
4  other than in his pockets, then I would strip
5  search him, yes.
6    Q.    Outside of an apartment? I mean in
7  a situation where you didn't have a warrant?
8    A.    Correct.
9    Q.    You've done that in the past?
10    A.    Yes, we have.
11    Q.    Is that still being done today?
12    A.    It was an isolated incident that I
13  was involved in, and we made a search. I haven't
14  run into that situation again on the street.
15    Q.    But you did do one on the street?
16    A.    I did, yes.
17    Q.    Recently?
18    A.    A couple of years ago.
19    Q.    Was the name of that person Lacey?
20    A.    That's correct.
21    Q.    Were you involved in that search?
22    A.    I was.
23    Q.    Did you order it?
24    A.    I authorized it.

11 (Pages 38 to 41)

WILLIAM F. FEENEY
January 10, 2005

Page 42

1    Q.    But you didn't do the actual
2  search?
3    A.    No, I did not.
4    Q.    Who did the search?
5    A.    Officer Hearns.
6    Q.    Who was the other officer there?
7    A.    There were several other officers
8  there.
9    Q.    Who was directly involved with
10  Hearns in the search?
11    A.    There were several other officers
12  present in close proximity when the search was
13  done.
14    Q.    So you don't realize that Boston
15  police regulations relative to strip search do
16  not allow any police search, strip search outside
17  the police station unless authorized by a
18  warrant, you don't realize that?
19        MR. COX:  Objection.
20    A.    No.  And, again, past practice has
21  always been if you have probable cause to arrest
22  somebody you have probable cause to search them.
23    Q.    Let me read you from Section 4 of
24  Rule 318D.  "Police officers are prohibited from

Page 43

1  conducting a strip search outside the confines of
2  the district station unless said search is
3  authorized by a warrant."  Are you familiar with
4  that passage?
5    A.    I've read it before, yes.
6    Q.    And so that makes absolutely clear
7  that you're not allowed to do a strip search
8  unless pursuant to a warrant, doesn't it?
9    A.    Well, I wasn't aware of that until
10  after the Lacey incident when it was brought to
11  my attention.
12    Q.    So are you saying now you don't do
13  that anymore?
14    A.    Again, I haven't run into that
15  situation on the street since then.
16    Q.    But you're saying you still would
17  do it again, if you ran into that situation?
18    A.    No.  At this point, no.
19    Q.    So you are aware of this.  But are
20  you telling me that regardless of the regulation
21  as a practice strip searches were conducted
22  without a warrant outside the police station
23  before the Lacey case?
24    A.    I can only speak for myself.  It

Page 44

1  was a case where I authorized the search to be
2  done.  I don't know what anybody else on the
3  street does.
4    Q.    But you were never told
5  specifically by any of your superiors that you
6  couldn't do that?
7    A.    Not sat down and told I couldn't do
8  it, no.
9    Q.    Now, what made the Lacey case the
10  type of case where you felt you could do a strip
11  search without a warrant outside of the police
12  station?
13        MR. COX:  Objection.
14    A.    We had Mr. Lacey, members of my
15  squad and the other squad had Mr. Lacey under
16  observation for quite some time.  We had a
17  confidential informant that was negotiating to
18  purchase some drugs from Mr. Lacey at that time.
19  Again, based on Mr. Lacey's actions when he was
20  en route back to the informant, we stopped
21  Mr. Lacey.
22        There was an incident where Officer
23  Hearns was involved just a week earlier or two
24  weeks earlier where when he was stopping somebody

Page 45

1  to arrest them on a warrant and he went to pat
2  them down the individual kept moving his body
3  around.  When they got him back into the station,
4  they found him to be in possession of a loaded
5  firearm.
6        Mr. Lacey was acting in the same
7  manner when Officer Hearns was trying to pat him
8  down.  To prevent injuries to any officers or to
9  put a prisoner in a vehicle with a firearm or
10  weapon, I'd rather deal with that issue on the
11  street, and at that point I authorized the search
12  of Mr. Lacey.
13    Q.    Are you saying you were searching
14  for a firearm and not drugs?
15        MR. COX:  Objection.
16    Q.    You authorized the search of Lacey
17  as a search for drugs.
18    A.    That's correct.
19        MR. COX:  I should point out
20  different counsel represents him in the Lacey
21  case.  So if there's going to be questions about
22  the facts of that --
23        MR. HRONES:  I understand that, but
24  it's still, you know, very much an issue, that

12 (Pages 42 to 45)

WILLIAM F. FEENEY
January 10, 2005

**Page 46**

1  type of search under different circumstances.
2  This isn't a criminal matter or anything.
3       MR. COX: I know.
4       Q.    But that situation which you
5  encountered with Lacey happens all the time when
6  you're dealing with surveillances of addicts in a
7  high drug area, does it not?
8       A.    What situation?
9       Q.    Well, the general facts related by
10  you as to the Lacey situation. That's not an
11  unusual situation when you're doing an
12  investigation of somebody who is trying to buy or
13  sell drugs, is it?
14      A.    Well, as Officer Hearns was
15  attempting to pat him down, every time he got to
16  a certain area around his groin area he kept
17  pulling away, and with having that thought in the
18  back of my mind about the other individual who
19  was dressed very similar to the way Mr. Lacey
20  was, I wanted to make sure that he didn't have a
21  firearm or weapon on him, and that's why I
22  authorized the search.
23      Q.    Well, you knew about Lacey before
24  that, didn't you?

**Page 47**

1       A.    I knew of him, yes.
2       Q.    And he'd been arrested many times,
3  hadn't he?
4       A.    Yes, he had been.
5       Q.    And he was a known addict?
6       A.    Yes, he was.
7       Q.    And you had never found a weapon on
8  him before, had you?
9       A.    I never arrested him before.
10      Q.    But you had no specific knowledge
11  that he had ever had a weapon on him?
12      A.    No, I didn't.
13      Q.    And there were several officers at
14  the scene of that search, were there not?
15      A.    Yes, there were.
16      Q.    So they could have easily
17  restrained him in such a way that a full pat down
18  could have been done, isn't that true?
19      MR. COX: Objection.
20      Q.    If you wanted to do a full pat
21  down, it could have been done?
22      MR. COX: Objection.
23      A.    That's open to argument.
24      Q.    Why couldn't a full pat down have

**Page 48**

1  been done if you, you know, had enough officers
2  to restrain the person during the pat down?
3       A.    It's just not the way we do things.
4       Q.    And he wasn't arrested, was he,
5  Lacey?
6       A.    No, he wasn't.
7       Q.    Now, have you ever done a body
8  cavity search?
9       A.    No.
10      Q.    Have you ever authorized one?
11      A.    I've written affidavits to have one
12  done by a physician, yes.
13      Q.    But it would have to be done by a
14  physician?
15      A.    That's correct.
16      Q.    You need a warrant?
17      A.    That's correct.
18      Q.    And was that true even before this
19  regulation --
20      A.    Yes, it was.
21      Q.    -- came into being?
22      A.    Yes, it was.
23      Q.    It has always been true?
24      A.    To the best of my recollection, it

**Page 49**

1  has been.
2       Q.    You've never done an invasive anal
3  cavity search?
4       A.    No, I haven't.
5       Q.    Are you aware that others have done
6  that?
7       A.    Not that I'm aware of, no.
8       Q.    Are you aware that one was done in
9  this case in that bathroom according to
10  Mr. Santiago?
11      A.    I'm aware that one was alleged by
12  Mr. Santiago.
13      Q.    And you have no knowledge as to
14  whether it was done or not, do you, in that
15  fashion?
16      A.    I've heard one side of the story
17  and I've heard allegations of another side of the
18  story.
19      Q.    But you weren't in that room?
20      A.    No, I wasn't.
21      Q.    And who was the officer who did the
22  search?
23      A.    That was Officer Marcus Eddings.
24      Q.    Did you ask him whether he did a

13 (Pages 46 to 49)

WILLIAM F. FEENEY
January 10, 2005

Page 50

1    anal cavity search?
2        A.    I know that an anal cavity search
3    is not authorized unless you have a warrant to do
4    it.
5        Q.    But did you ask him whether he did
6    that type of search?
7        A.    I would have no need to ask him
8    that because I know that he knows it's
9    prohibitive to do it unless you have a search
10   warrant. It is to be done in a medical facility
11   by a trained medical doctor.
12       Q.    My question was, did you ever ask
13   him whether he did an anal cavity search?
14       A.    No, I didn't.
15       Q.    And you say you didn't because he
16   wasn't suppose to do it and you just assumed he
17   didn't?
18       A.    I didn't ask him because I didn't
19   think there was a need to ask him.
20       Q.    Even though an allegation had been
21   made by Mr. Ivan Santiago that that had taken
22   place and he even went down to the IAD to make a
23   formal complaint?
24       A.    Well, that was certainly done after

Page 51

1    the search was completed at the apartment, at
2    58 Cheney Street. Upon Officer Eddings coming
3    out of the bathroom with Mr. Santiago, I had no
4    reason to ask him if a body cavity search had
5    been done.
6        Q.    Now, did the officers have gloves
7    on that day?
8        A.    I believe everybody had gloves on,
9    yes.
10       Q.    Is that standard practice to wear
11   gloves when you enter into an apartment to search
12   for drugs?
13       A.    Once you're in the apartment while
14   you're searching it's a good policy to have
15   gloves on.
16       Q.    And what do you do with the gloves
17   when you're through with the search?
18       A.    Most times they're discarded in the
19   trash cans at the apartment. Sometimes we'll
20   take them with us.
21       Q.    Is there any policy relative to
22   where they're suppose to be discarded?
23       A.    None that I'm aware of.
24       Q.    Even today there's no new policy on

Page 52

1    that?
2        A.    Nothing that I've seen in writing.
3        Q.    Well, what about apart from
4    writing, has anyone informed you that the gloves
5    should be taken with you when you leave?
6        A.    Not that I can recall, no.
7        Q.    Now, when you do a strip search,
8    how do you go about doing it, in terms of what
9    you tell the person who's being strip searched?
10       A.    The way I do it, I ask the
11   individual to take off an article of clothing one
12   piece at a time. Once they get down to their
13   shorts, I'll have them drop their shorts down.
14   I'll have them lift up their scrotum. I'll have
15   them bend over and spread their buttocks, and the
16   strip search is completed.
17       Q.    You ask them to spread their
18   buttocks?
19       A.    That's correct.
20       Q.    And when they do that, you look up
21   their buttocks?
22       A.    I just want to make sure that
23   there's nothing stuck between the cheeks of the
24   buttocks.

Page 53

1        Q.    So do you look up their buttocks
2    when they spread their buttocks?
3        A.    I look to make sure that there's
4    nothing stuck there, yes.
5        Q.    And you don't consider that to be
6    an anal cavity search?
7        A.    No.
8        Q.    If you were to use your own hands
9    to do the same thing, would you consider that to
10   be an anal cavity search?
11       A.    My understanding of an anal cavity
12   search is the penetration into the anus, not a
13   visual inspection.
14       Q.    So you could use your own hands to
15   pull the cheeks apart if you wanted --
16           MR. COX:    Objection.
17       Q.    -- and it wouldn't be prohibitive?
18           MR. COX:    Objection.
19       A.    Again, I don't believe that's
20   considered an anal cavity search.
21       Q.    So you believe in order for it to
22   be a body cavity search there has to be actual
23   penetration?
24       A.    That's correct.

14 (Pages 50 to 53)

WILLIAM F. FEENEY
January 10, 2005

Page 54

1    Q.    And where did you get that
2    definition?
3    A.    That's just the way it's been
4    explained to me.
5    Q.    But have you looked at the
6    regulation?
7    A.    I don't think it delineates it in
8    the regulation as to exactly a definition of a
9    body cavity search.
10   Q.    Doesn't it define it as a manual
11   inspection, an internal manual inspection of any
12   human body cavity?
13   A.    Well, again, that would be the
14   insertion into the anal cavity, not just the
15   inspecting of the outer buttocks.
16   Q.    But doesn't it define it as an
17   internal manual inspection of any human body
18   cavity? It doesn't say anything about the
19   insertion of something into the cavity, does it?
20   A.    It's internal. It's beyond the
21   plane of the rectum, so it's internal. It's
22   inside the body.
23   Q.    So when someone pulls their cheeks
24   apart, you're in a position to view inside the

Page 55

1    person, right?
2    A.    No.
3    Q.    Well, inside their rectum.
4    A.    No.
5    Q.    If they pull their cheeks apart,
6    you can see inside the rectum?
7    A.    No, you can't.
8    Q.    You can't?
9    A.    No.
10   Q.    What do you see?
11   A.    What you see is you see the hole,
12   the anus hole of the rectum. You can't see
13   inside the body.
14   Q.    Well, you can see something that
15   you don't see if the cheeks aren't pulled apart,
16   right?
17   A.    Yeah, but again, it's not an
18   internal inspection. It's an external
19   inspection.
20   Q.    That's your opinion, right?
21        MR. COX: Objection.
22   A.    That's my interpretation of it,
23   yes.
24   Q.    And do you know the rules for a

Page 56

1    strip search in the station house?
2    A.    Yes, I do.
3    Q.    And what are those rules?
4    A.    Under custodial circumstances, the
5    duty supervisor is to be notified that you're
6    requesting a strip search. They make a
7    determination whether a strip search is going to
8    be conducted or not and then ensure that it's
9    noted in the police report.
10   Q.    And what do they need, what
11   standard of proof do they need to do a search?
12   A.    Probable cause.
13   Q.    And is it your position that same
14   standard is required to do the strip search in
15   the apartment?
16   A.    Yes.
17   Q.    Now, was Ivan Santiago in custody
18   that night?
19   A.    He was being detained. He wasn't
20   in custody. He wasn't under arrest.
21   Q.    He wasn't under arrest?
22   A.    No.
23   Q.    You're only in custody when you're
24   under arrest?

Page 57

1    A.    That's correct.
2    Q.    So he was just being detained?
3    A.    That's correct.
4    Q.    Now, did you review anything before
5    coming here today to testify?
6    A.    I did, yes.
7    Q.    What did you review?
8    A.    I reviewed a copy of the 1-1 the
9    other day when I met with Mr. Cox as well as a
10   copy of my interview with internal affairs.
11   Q.    Did you review Eddings transcript?
12   A.    No, I didn't.
13   Q.    Now, were you ever terminated from
14   any job?
15   A.    Yeah, I was. I was fired from one
16   job.
17   Q.    What job was that?
18   A.    I was working maintenance at
19   Charles River Park.
20   Q.    And why were you fired?
21   A.    I had a disagreement with one of
22   the supervisors there.
23   Q.    What was the disagreement?
24   A.    I can't recall.

WILLIAM F. FEENEY
January 10, 2005

Page 58

1    Q.    He said you fell asleep on the job?
2    A.    I think that may have been the crux
3  of the disagreement we had, yeah.
4    Q.    So how many years have you been a
5  police officer?
6    A.    A little over 16 years.  I came on
7  the job in 1988.
8    Q.    And as far as you know, you're
9  going to stay on the drug squad?
10   A.    Until somebody tells me different,
11 sure.
12   Q.    That's all I have.
13        MR. COX:  I don't have any
14 questions.
15        (Deposition concluded at 11:01 a.m.)
16
17
18
19
20
21
22
23
24

Page 59

1        C E R T I F I C A T E
2        I, Maryellen Coughlin, a Registered
3  Professional Reporter and Notary Public of the
4  State of Massachusetts, do hereby certify that
5  the foregoing is a true and accurate transcript
6  of my stenographic notes of the deposition of
7  WILLIAM F. FEENEY, who appeared before me,
8  satisfactorily identified themself, and was by
9  me duly sworn, taken at the place and on the
10 date hereinbefore set forth.
11       I further certify that I am neither
12 attorney nor counsel for, nor related to or
13 employed by any of the parties to the action in
14 which this deposition was taken, and further
15 that I am not a relative or employee of any
16 attorney or counsel employed in this case, nor
17 am I financially interested in this action.
18       THE FOREGOING CERTIFICATION OF THIS
19 TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF
20 THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT
21 CONTROL AND/OR DIRECTION OF THE CERTIFYING
22 REPORTER.
23
24       MARYELLEN COUGHLIN, RPR

Page 60

1        UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF MASSACHUSETTS
3              C.A. NO. 04CV10746JLT
4
5   * * * * * * * * * * * * * * * * * *
6   IVAN SANTIAGO,              *
7         Plaintiff        *
8   vs.                          *
9   WILLIAM J. FEENEY, MARCUS    *
10  EDDINGS, AND THE CITY OF BOSTON,  *
11        Defendants        *
12  * * * * * * * * * * * * * * * * * *
13
14       I, WILLIAM F. FEENEY, do hereby
15 certify, under the pains and penalties of
16 perjury, that the foregoing testimony is true
17 and accurate, to the best of my knowledge and
18 belief.
19       WITNESS MY HAND THIS ____ day of
20 _____, 2005.
21
22       _____
23              WILLIAM F. FEENEY
24

Page 61

1  Today's Date:    February 5, 2005
2  To:       Stephen G. Cox, Esq.
3  Copied to:    Stephen Hrones, Esq.
4  From:     Maryellen Coughlin, RPR
5  Deposition of:  William F. Feeney
6  Taken:     January 10, 2005
7  Action:    Santiago vs. Feeney, et al
8
9        Enclosed is a copy of Mr. Feeney's
10 deposition.  Pursuant to agreement of counsel,
11 Mr. Feeney has forty-five days to sign the
12 deposition from today's date.
13       Please have Mr. Feeney sign the
14 enclosed signature page.  If there are any
15 errors, please have him mark the page, line, and
16 error on the enclosed correction sheet.  He
17 should not mark the transcript itself.  This
18 addendum should be forwarded to all interested
19 parties.
20       Thank you for your cooperation in this
21 matter.
22
23
24

CATUOGNO COURT REPORTING SERVICES
Springfield, MA   Worcester, MA   Boston, MA   Providence, RI   Manchester, NH

WILLIAM F. FEENEY
January 10, 2005

Page 62

1           CORRECTION SHEET
2    DEPONENT:  WILLIAM F. FEENEY
3    CASE:  SANTIAGO VS. FEENEY, ET AL
4    DATE TAKEN:  1/10/05
5    ***************************************************
6    PAGE /  LINE / CHANGE OR CORRECTION AND REASON
7        /   /
8        /   /
9        /   /
10       /   /
11       /   /
12       /   /
13       /   /
14       /   /
15       /   /
16       /   /
17       /   /
18       /   /
19       /   /
20       /   /
21       /   /
22       /   /
23       /   /
24       /   /

CATUOGNO COURT REPORTING SERVICES
Springfield, MA    Worcester, MA    Boston, MA    Providence, RI    Manchester, NH