# EXHIBIT C

WILLIAM F. FEENEY
January 10, 2005

```
                                                          Page 1
 1              UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF MASSACHUSETTS
 3                 C.A. NO. 04CV10746JLT
 4
 5     * * * * * * * * * * * * * * * * * *
 6     IVAN SANTIAGO,                           *
 7                  Plaintiff                   *
 8     vs.                                      *
 9     WILLIAM J. FEENEY, MARCUS                *
10     EDDINGS, AND THE CITY OF BOSTON,         *
11                  Defendants                  *
12     * * * * * * * * * * * * * * * * * *
13
14            DEPOSITION OF WILLIAM F. FEENEY
15                    HRONES & GARRITY
16                Lewis Wharf Bay, Suite 232
17                  Boston, Massachusetts
18            January 10, 2005      10:05 a.m.
19
20
21
22                   Maryellen Coughlin
23            Registered Professional Reporter
24
```

WILLIAM F. FEENEY
January 10, 2005

Page 2

1  APPEARANCES:
2
3  Representing the Plaintiff:
4      HRONES & GARRITY
5      Lewis Wharf Bay, Suite 232
6      Boston, Massachusetts 02110
7      BY: Stephen Hrones, Esq.
8      (617) 227-4019
9
10 Representing the Defendants:
11     City of Boston
12     Law Department
13     City Hall, Room 615
14     Boston, Massachusetts 02201
15     BY: Stephen G. Cox, Esq.
16     (617) 635-4064  (617) 635-3199

Page 3

1               INDEX
2
3  WITNESS:   WILLIAM F. FEENEY
4
5  EXAMINATION:                     Page
6  MR. HRONES                         4
7
8
9
10
11 EXHIBITS FOR IDENTIFICATION:
12 No.     Description          Page
13   None

Page 4

1           PROCEEDINGS
2
3      MR. HRONES: The usual
4  stipulations?
5      MR. COX: Yes.
6      MR. HRONES: All objections saved
7  until the time of trial except motions to strike.
8      MR. COX: And form.
9      MR. HRONES: And form. Does he
10 want to read and sign?
11     MR. COX: Yes.
12     MR. HRONES: Waive the notary?
13     MR. COX: Correct. Can we have 45
14 days?
15     MR. HRONES: Fine.
16
17     WILLIAM F. FEENEY,
18 having been first duly sworn, was examined
19 and testified as follows:
20
21          EXAMINATION
22 BY MR. HRONES:
23   Q.  What is your name, please?
24   A.  William J. Feeney.

Page 5

1   Q.  Where do you live?
2   A.  Excuse me.
3   Q.  Where do you live?
4       MR. COX: Well, home address is --
5   Q.  No, the town or -- do you live in
6  the City of Boston?
7   A.  No, I don't.
8       MR. COX: Business address.
9   Q.  Okay. What's your profession?
10  A.  I'm a police officer and a sergeant
11 detective.
12  Q.  And how long have you been a police
13 officer?
14  A.  A little over 16 years.
15  Q.  And when were you born?
16  A.  3/26/1958.
17  Q.  And where were you born?
18  A.  In Boston.
19  Q.  Where did you go to high school?
20  A.  Charlestown High.
21  Q.  You graduated?
22  A.  I did.
23  Q.  And what did you do upon
24 graduation?

2 (Pages 2 to 5)

CATUOGNO COURT REPORTING SERVICES

WILLIAM F. FEENEY
January 10, 2005

Page 14

1  reports because they were not aware of that one
2  paragraph down at the bottom of the rule and
3  regulation.
4  Q. Are they now being put in all
5  police reports, as far as you know?
6  A. As far as I know, yes. With
7  respect to my squad. I can't say what the rest
8  of the drug unit is doing.
9  Q. And you head up a squad?
10 A. I do.
11 Q. Of how many men?
12 A. One detective and four officers.
13 Q. And did you inform them all very
14 clearly that they had to put it in the police
15 report?
16 A. After this incident, I informed my
17 old squad, and when I took over as the new boss
18 in District 13, I informed them also.
19 Q. And who's your boss now?
20 A. The Lieutenant detective in charge
21 of the drug unit, Stephen Meade.
22 Q. Were you involved in a search on
23 Cheney Street on March 20th of 2003?
24 A. Yes, I was.

Page 15

1  Q. In what capacity?
2  A. I was the supervisor in charge.
3  Q. Did you head a drug unit at that
4  point?
5  A. I was in charge of one of the two
6  squads at Area B-2 at that time, yes.
7  Q. And were both squads involved in
8  that?
9  A. Members of both squads were
10 involved, yes.
11 Q. But you were in charge?
12 A. That's correct.
13 Q. And why is that, as opposed to the
14 person that was the head of the other squad?
15 A. He was unavailable at the time.
16 Q. What was his name?
17 A. Sergeant Detective Linskey.
18 Q. So he wasn't in on that search?
19 A. No, he wasn't.
20 Q. Even though he was listed as being
21 in on the search?
22 A. I don't know if he was listed as
23 being on the search. I know that his name did
24 appear on one piece of paper, which is common

Page 16

1  because we prepare certain documents with
2  everybody's name on them when we're doing joint
3  investigations or joint search warrants, and it
4  appears that his name wasn't taken off it.
5  Q. And what document was his name on?
6  A. It's what we call a white sheet
7  which documents all the individuals present as
8  well as any drugs that are seized and any
9  defendants that are arrested.
10 Q. His name was on that white sheet?
11 A. I believe so, yes.
12 Q. Now, were you involved in the
13 investigation leading up to the search?
14 A. No, I wasn't.
15 Q. Who conducted that?
16 A. The applicant on the search warrant
17 was Officer Paul Quinn.
18 Q. And he was within your unit or the
19 other unit?
20 A. He was in the other squad of B-2.
21 Q. So the other squad did most of the
22 preparatory work?
23 A. That's correct.
24 Q. But you were present when the entry

Page 17

1  was made?
2  A. That's correct.
3  Q. And where did you enter the
4  apartment?
5  A. We all entered in through the same
6  door, the front door of the apartment.
7  Q. Everyone came in the front?
8  A. That's correct.
9  Q. Didn't someone go around to the
10 back?
11 A. We, as a group, made an entry. We
12 came in through the back of the building, and we
13 entered in through the rear common hallway door
14 in the back of the building which then brought us
15 up to the front door of the apartment.
16 Q. Was it a surprise entry?
17 A. No, they saw us coming. We were
18 making our way into the common hallway.
19 Q. Did you hear anyone yell out?
20 A. I heard some yelling coming. I
21 couldn't distinguish what it was, but somebody
22 further on up the line stated that they're
23 yelling were coming, the police are coming, 50 is
24 coming.

5 (Pages 14 to 17)

CATUOGNO COURT REPORTING SERVICES
Springfield, MA   Worcester, MA   Boston, MA   Providence, RI   Manchester, NH

WILLIAM F. FEENEY
January 10, 2005

Page 18

1  Q. What does 50 mean?
2  A. 50 is street slang for police.
3  Q. By people on the street?
4  A. That's correct.
5  Q. Do you know the origins of that,
6  why they say 50?
7  A. Some people I've talked to said it
8  goes back to the old days of the TV show Hawaii
9  50.
10 Q. What did you do when you went in
11 the apartment?
12 A. As I went into the apartment, other
13 officers were in there ahead of me. They started
14 sweeping the apartment for individuals in the
15 apartment. I observed one individual seated on
16 the couch in the living room. There was another
17 one that was just starting to exit from a
18 doorway, which appeared to be a bedroom right off
19 the living room, and then there was a female
20 which was -- I believe she was either in the
21 kitchen or right near the kitchen, the hallway,
22 and where there was a small juvenile child that
23 was also in the apartment.
24 Q. Who was the subject of the search

Page 19

1  warrant?
2  A. Rolando Lugo.
3  Q. Was he in there?
4  A. Yes, he was.
5  Q. Did the officers know who he was
6  when they entered?
7  A. Officer Quinn knew who he was, yes.
8  Q. Had he made a buy from him himself?
9  A. I'm not familiar with the
10 circumstances surrounding the investigation.
11 Q. So what did you do?
12 A. As we do in all search warrants we
13 had everybody brought into the living room till
14 we made sure everybody was secured.
15 Q. I'm not interested in all search
16 warrants. I'm saying in this case.
17 A. Everybody was brought into the
18 living room.
19 Q. By you?
20 A. No, by anybody that found an
21 individual in the apartment.
22 Q. But what did you do specifically?
23 A. I just stood there at the time
24 because I had nothing to do, except supervise.

Page 20

1  Q. And did you have any conversation
2  with the woman?
3  A. No.
4  Q. Was she searched?
5  A. She was searched, yes.
6  Q. By whom?
7  A. A female officer.
8  Q. And what type of search?
9  A. When the female officer came to the
10 apartment, I just asked that she search her. She
11 took her into another room and searched her.
12 Q. Was it a strip search?
13 A. I wasn't in there. I don't know.
14 Q. Well, didn't you ask her whether it
15 was?
16 A. I asked her to search her. She
17 came back and told me she didn't have anything on
18 her. I didn't ask whether she strip searched her
19 or whether she just patted her down.
20 Q. But if she had stripped searched
21 her, you would have had to put that in the
22 report?
23 A. That's correct.
24 Q. So now you ask the nature of the

Page 21

1  search, don't you, when you have a matron search
2  a female? Don't you inquire as to the nature of
3  the search?
4  A. No.
5  Q. Because you would have to put that
6  in your report as the supervisor.
7  A. Well, if I told her to strip search
8  her, then I'd know it was a strip search. I just
9  asked her to search her, that's all I asked her
10 to do.
11 Q. And so you assumed she didn't strip
12 search?
13 A. I assumed she didn't, no.
14 Q. Because if you want a strip search
15 you specifically indicate that?
16 A. I would have indicated it to her,
17 yes.
18 Q. What about Lugo, was he searched?
19 A. Yes, he was.
20 Q. Initially what type of search was
21 done of him?
22 A. Initially he had retrieved drugs
23 from the back of his pants area, from between his
24 buttocks.

6 (Pages 18 to 21)

Page 30

1 warrant says we can search everyone in the
2 apartment that gives you authority to search
3 anybody in the apartment without having any
4 specific knowledge of involvement by that person?
5    A.   That's what the past practice has
6 been, yes.
7    Q.   And it's the present practice
8 today, too?
9    A.   Unless -- I mean -- again, I can't
10 remember reading a --
11   Q.   Okay. Let's say you go into an
12 apartment, and you're after a, you know, one
13 person who is an alleged drug dealer, and you see
14 another adult you know nothing about, just
15 sitting in the apartment, it's your position that
16 you have the authority to search that person to
17 the extent that you go in their pockets?
18   A.   If the warrant indicates that we
19 can search any and all persons present, yes.
20   Q.   And you don't need further probable
21 cause? Once that warrant says you can search
22 everyone, you don't have to have any additional
23 probable cause?
24   A.   Well, based on the affidavit that

Page 31

1 accompanies the application for the search
2 warrant, having a neutral and detached party, be
3 it either a clerk magistrate or a judge, reading
4 that application and reading the accompanying
5 affidavit, if they choose to decide that there's
6 probable cause to search any and all persons
7 present that are in the apartment when we execute
8 the warrant, then we feel that they've authorized
9 us to search them.
10   Q.   And that's almost invariably the
11 case when you get a warrant for the search of an
12 apartment, that the magistrate gives you
13 authority to search any and all persons there, is
14 that the case?
15   A.   No, some don't.
16   Q.   But most of them do, don't they?
17   A.   I would say maybe a good percentage
18 of them do.
19   Q.   Well, do you ask for that authority
20 or the magistrate just checks that off if he
21 wants?
22   A.   Sometimes the officers will request
23 it. Sometimes he'll ask the officer if they want
24 to search any and all persons present.

Page 32

1    Q.   Now, what about a strip search, do
2 you believe that warrant gives you authority to
3 strip search anyone who's in the apartment,
4 regardless of whether you have any basis to
5 believe they're involved in the drug dealing?
6    A.   Well, again, it depends on the
7 circumstances there. I mean, in this particular
8 case, Mr. Lugo had drugs secreted down the back
9 of his pants, in between the cheek of his
10 buttocks. It wouldn't be uncommon for somebody
11 else that was involved in it to have drugs
12 secreted in the same place.
13   Q.   But my question was, without any
14 other factors coming into play as to the specific
15 evidence, do you believe that that search warrant
16 that says search any and all people authorizes a
17 strip search, apart from any other factors?
18   A.   It's taken on a case-by-case
19 individual basis.
20   Q.   But it says, does it not, search
21 any and all persons, so you're saying that
22 doesn't give you authority to strip search
23 everyone in the apartment without having more, or
24 do you think that gives you authority to strip

Page 33

1 search everybody?
2    A.   Well, it's kind of a two-part
3 question.
4    Q.   Okay, let me make it clear. Is it
5 your position that a warrant that says you can
6 search any and all persons found in the apartment
7 gives you authority, if you want, to strip search
8 anyone in that apartment?
9    A.   No.
10   Q.   So you believe as to strip search,
11 as opposed to an ordinary search, putting your
12 hands in a pocket, you need something more than
13 the warrant authorizing a search of everybody?
14   A.   Again, it's on a case-by-case
15 basis, depending upon how the officers feel after
16 talking to the individual that they're searching,
17 as to whether we strip search them or not.
18   Q.   But my question was once again, is
19 it your position that a search warrant that
20 allows you to search any and all persons allows
21 you to strip search anyone there if you want,
22 without any other factors?
23   A.   No.
24   Q.   It doesn't?

WILLIAM F. FEENEY
January 10, 2005

Page 34

1    A.    No.
2    Q.    So you need something else in order
3 to do a strip search?
4    A.    That's correct.
5    Q.    And why do you say that?
6    A.    Again --
7    Q.    Why do you say you need something
8 more?
9    A.    Well, a strip search is certainly
10 more of an intrusive action towards somebody.
11 And, again, if we have a search warrant that says
12 any and all persons present, we usually search
13 any and all persons present. We also have a
14 conversation with the individuals. If the
15 officer feels that they may be concealing
16 something else on them that they can't detect
17 through going through their pockets, then a strip
18 search will be done.
19    Q.    Did you authorize a strip search in
20 this case?
21    A.    I told Officer Eddings to take
22 Mr. Santiago into the bathroom and search him.
23    Q.    Did you intend that he do a strip
24 search?

Page 35

1    A.    I thought he was going to, yes.
2    Q.    And what was the basis for your
3 ordering him to do a strip search?
4    A.    Again, we found drugs in the
5 apartment. We found drugs on the person,
6 Mr. Lugo, concealed in an area that wouldn't be
7 detected normally by doing a regular search.
8    Q.    Did you have any evidence, other
9 than what you just mentioned, to suggest Santiago
10 was involved in drug dealing?
11    A.    I didn't know at that time. I
12 hadn't read the affidavit, as I said. The only
13 one that was specifically named in the warrant
14 was Mr. Lugo.
15    Q.    And you've read it since, haven't
16 you?
17    A.    The affidavit or the application?
18    Q.    Yes.
19    A.    No, I haven't read the application,
20 no.
21    Q.    But the affidavit you've read?
22    A.    The affidavit, no, I haven't.
23    Q.    So you authorized a strip search
24 solely on the basis that Lugo had said I have

Page 36

1 stuff in my ass and took it out, is that right?
2    A.    I felt that Santiago could have
3 drugs secreted somewhere on his body that
4 wouldn't be detected by a normal search.
5    Q.    But you certainly didn't have
6 probable cause to believe he had drugs secreted
7 in a way that only a strip search would reveal
8 them, did you?
9    A.    Well, we had probable cause to
10 search any and all persons present on the
11 premises when we entered.
12    Q.    I'm saying this specific
13 individual. You had probable cause to enter the
14 apartment, right --
15    A.    That's right.
16    Q.    -- to search for drugs. My
17 question is, you didn't have specific probable
18 cause to believe that Santiago had drugs secreted
19 in such a way that you had to do a strip search,
20 did you?
21    A.    We didn't have any firsthand
22 knowledge of it, no.
23    Q.    But you had a suspicion that he
24 might because the other guy had it?

Page 37

1    A.    I felt there was a good probability
2 he did, yes.
3    Q.    Why did you figure there was a good
4 probability that Santiago had it up his rear end
5 if Lugo did?
6    A.    A lot of times, and not every time,
7 but a lot of times when we go into these
8 locations there's more than one person that's in
9 the apartment that's involved in the
10 distribution, involved in the sale of drugs from
11 those locations or they have other people holding
12 the drugs for them.
13    Q.    Well, do you believe that a strip
14 search is an extreme invasion of a person's
15 privacy?
16    A.    It is to a certain extent an
17 invasion of privacy, yes.
18    Q.    Now, were you present when the
19 search was going on in the bathroom?
20    A.    I was present in the apartment.
21    Q.    Were you standing outside the door?
22    A.    No, I wasn't.
23    Q.    Was there another officer standing
24 outside the door?

10 (Pages 34 to 37)